ROBINSON v CITY OF DETROIT

COOPER v WADE

Docket Nos. 110360, 107421. Argued November 8, 1999 (Calendar Nos. 1-
2). Decided July 18, 2000. Rehearing denied in *Cooper*, 463 Mich
1210.

Brenda Cooper, for herself and as next friend of Marlon Cooper, a
minor, and Toni Morris, for herself and as next friend of Martell
Morris, a minor, brought suit in the Wayne Circuit Court, Edward
M. Thomas, J., against Lonnie Wade and Arthur Gulley, Detroit
police officers, and the city of Detroit for injuries received by the
minors when the automobile in which they were voluntary passen-
gers crashed into a house while the officers were in pursuit. The
trial court granted summary disposition for the officers and the
city, holding that the police do not have a duty to passengers in a
pursued vehicle, that governmental immunity applied to the city,
and that the officers were acting within the scope of their employ-
ment, and therefore immune. The Court of Appeals, REILLY, P.J.
(MICHAEL J. KELLY and C. L. BOSMAN, JJ., concurring), reversed, hold-
ing that the officers owed a duty to the passengers in the fleeing
vehicle, and that the plaintiffs' claims fell within the motor vehicle
exception to governmental immunity. With respect to the officers,
the Court held that plaintiffs pleaded a claim in avoidance of gov-
ernmental immunity. 218 Mich App 649 (1996) (Docket No. 175952).

Debra Robinson, as personal representative of the estate of Courtney
Henderson, deceased, brought an action in the Wayne Circuit
Court, Susan Bieke Neilson, J., against the city of Detroit and
Detroit police officers Craig Kailimai and Michael Cily. Courtney
was a voluntary passenger in an automobile that fled from the
officers and collided with another vehicle while the officers were
in pursuit, killing him. The trial court granted the defendants'
motion for summary disposition, holding that they did not owe a
duty to plaintiff's decedent, that the plaintiff's claim fell under the
motor vehicle exception to governmental immunity, and that the
officers' actions were not the proximate cause of plaintiff's injuries.
The Court of Appeals, O'CONNELL, P.J., and GRIBBS and T. P. PICKARD,
JJ., affirmed (Docket No. 176421), and then granted rehearing on its
own motion to review the apparent conflict with *Cooper*. On

rehearing, the Court reversed. A special panel of the Court of Appeals subsequently was convened, and the Court, WAHLS, P.J., and HOOD, SAAD, HOEKSTRA, and MARKEY, JJ. (JANSEN and NEFF, JJ., dissenting), affirmed, holding that the police owe no duty to a voluntary passenger in a fleeing vehicle. 225 Mich App 14 (1997). The plaintiff appeals.

In an opinion by Justice TAYLOR, joined by Chief Justice WEAVER, and Justices CORRIGAN, YOUNG, and MARKMAN, the Supreme Court *held*:

The police owe a duty to innocent passengers, but owe no duty to passengers who are themselves wrongdoers, whether they help bring about the pursuit or encourage flight. Passengers who seek to recover for injuries allegedly caused by a negligent police pursuit bear the burden of proving their innocence as a precondition to establishing the duty element of a cause of action. The city of Detroit is entitled to judgment as a matter of law because it cannot reasonably be concluded under a narrow reading of the motor vehicle exception to governmental immunity, MCL 691.1405; MSA 3.996(105), that the plaintiffs' injuries resulted from the operation of the police vehicles. An officer's physical handling of a motor vehicle during a police chase can constitute negligent operation of a motor vehicle within the motor vehicle exception; however, the plaintiffs' injuries did not, as a matter of law, result from the operation of the police vehicles where the police vehicles did not hit the fleeing vehicle or physically cause another vehicle, or object to hit the vehicle that was being chased, or physically force the vehicle off the road or into another vehicle. An officer's decision to pursue does not constitute the negligent operation of a motor vehicle. The individual police officers are immune from liability because their actions were not "the proximate cause" of the plaintiffs' injuries.

1. In the context of a police pursuit, it is irrelevant whether a wrongdoer is a driver or a passenger or whether an innocent person is inside or outside a vehicle. Whatever their location, the police owe a duty to innocent persons, but owe no duty to a wrongdoer, whether the wrongdoer is the fleeing driver or a passenger. Thus, a plaintiff has the burden of proving that a passenger in a vehicle being pursued by the police was an innocent person and that the police therefore owed the passenger a duty.

2. Where no genuine issue of material fact exists regarding the status of a passenger, summary disposition may be appropriate. However, when a genuine issue of material fact exists concerning whether a passenger is innocent or a wrongdoer, and thus whether the police owed a duty, the question is appropriately resolved by the trier of fact. In these cases, the issue of the passengers' status

has not been sufficiently developed, thereby making summary disposition on the basis of duty inappropriate.

3. The grant of immunity in MCL 691.1407(1); MSA 3.996(107)(1) is broad, and exceptions to the statute are to be narrowly construed. The motor vehicle exception requires that a plaintiff's injuries result from the operation of a government vehicle. Given the fact that the motor vehicle exception must be narrowly construed, plaintiffs cannot satisfy the "resulting from" language of the statute where the pursuing police vehicle did not hit the fleeing car or otherwise physically force it off the road or into another vehicle or object. Also, the decision to pursue a fleeing motorist, which is separate from the operation of the vehicle itself, is not encompassed within a narrow construction of the phrase "operation of a motor vehicle." Allowing a police officer's decision to pursue to be construed as the operation of a motor vehicle, and therefore fall under an exception to governmental immunity, conflicts with the police officer's duty to apprehend criminal suspects.

4. The statutory phrase "the proximate cause" is best understood as meaning the one most immediate, efficient, and direct cause preceding an injury. MCL 691.1407(2)(c); MSA 3.996(107)(2)(c) provides tort immunity for employees of governmental agencies unless the employee's conduct amounts to gross negligence that is the one most immediate, efficient, and direct cause of the injury or damage, i.e., the proximate cause. In these cases, the officers in question are immune from suit in tort because their pursuit of the fleeing vehicles was not, as a matter of law, "the proximate cause" of the injuries sustained by the plaintiffs. The one most immediate, efficient, and direct cause of the plaintiffs' injuries was the reckless conduct of the drivers of the fleeing vehicles. Summary disposition for the defendant officers was proper because reasonable jurors could not find that the officers were "the proximate cause" of the injuries.

Justice CORRIGAN, concurring, stated that the Court's decision restores judicial legitimacy by overruling decisions that wrongly usurped the power of the Legislature. Principles of stare decisis do not apply to plurality opinions, dicta from previous cases, or cases considered anew on motions for rehearing. More fundamentally, the Supreme Court has displayed a proper respect for judicial restraint while discharging its weighty responsibility to the people of Michigan to uphold the constitution and laws. The rule of stare decisis is not an inexorable command. To preserve the legitimacy of the judicial branch, the Supreme Court must not exceed the limits of its constitutional authority. While too rapid change in the law threatens judicial legitimacy, the act of correcting past rulings that usurp power properly belonging to the legislative branch does not

threaten legitimacy. Rather, it restores legitimacy. If a prior decision of the Supreme Court reflects an abuse of judicial power at the expense of legislative authority, a failure to recognize and correct that excess, even if done in the name of stare decisis, would perpetuate an ongoing and unacceptable abuse of judicial power.

*Robinson*, affirmed.

*Cooper*, reversed.

Justice KELLY, joined by Justice CAVANAGH, concurring in part and dissenting in part, stated that a police officer's negligence need not be the only or most direct proximate cause of an injury in order to allow recovery. The majority's decision to overturn well-reasoned Supreme Court precedent and reinstate contributory negligence by judicial fiat is mistaken and unwarranted.

Construing the phrase "the proximate cause" to require one cause contradicts longstanding recognition in the Supreme Court case law that there may be two or more concurrent and directly cooperative and efficient proximate causes of an injury. There is neither a textual nor an historical basis on which to find that the Legislature intended that MCL 691.1407(2)(c); MSA 3.996(107)(2)(c) be construed to require only one cause. The majority's rule, relieving a government employee of all liability for negligence if another tortfeasor is negligent, however slightly, as long as the other's negligence is later, in effect revives the doctrine of contributory negligence with respect to government employees. Applying its rationale, a pursuing police officer will never be the only proximate cause of an injury to an innocent passenger; if a vehicle is fleeing the police, its driver will always be a wrongdoer. Had the Legislature intended to exempt government tortfeasors and enact a separate standard of proximate causation with respect to them, it would have included it in recently amended MCL 600.6304(1); MSA 27A.6304(1), which makes clear that all tortfeasors, whether government agents or not, are subject to the same standards for purposes of liability.

The majority overrules the proximate cause analysis of *Fiser v Ann Arbor*, 417 Mich 461 (1983), and *Rogers v Detroit*, 457 Mich 125 (1998), holding that an officer's decision to pursue does not constitute the negligent operation of a motor vehicle. It also overrules *Dedes v Asch*, 446 Mich 99 (1994), holding that the phrase "the proximate cause" as used in the employee immunity statute, MCL 691.1407(2); MSA 3.996(107)(2), means the one most immediate, efficient, and direct cause preceding an injury, not a proximate cause. The decision to overrule three distinct, well-reasoned lines of cases is unparalleled. Instead of determining whether *Fiser* and *Rogers* were deliberately examined and decided by a court of com-

petent jurisdiction, the majority first uses the dictionary to define the term "resulting from." But instead of analyzing whether the plaintiffs' injuries resulted from the defendant's action, it merely concludes that the plaintiffs cannot satisfy the "resulting from" language of the statute where the pursuing police vehicle did not hit the fleeing car or otherwise physically force it off the road or into another vehicle or object. The doctrine of stare decisis applies with full force to decisions construing statutes or ordinances. The wisdom of this rule becomes apparent when members of the Supreme Court apply contrived meanings to the language of statutes instead of using accepted legal analysis. This casual disregard for past precedent suggests to future courts that they do the same and creates instability in the law of Michigan.

Clearly, the motor vehicle exception allows plaintiffs to recover when government entities negligently operate a motor vehicle. The Legislature has made it clear that emergency vehicles may exceed posted speed limits only in a manner that will not endanger life or property. Neither the language of the motor vehicle exception nor MCL 257.603(3)(c); MSA 9.2303(3)(c) address the duty to apprehend criminal suspects. The majority places a higher premium on this consideration, in derogation of the explicit intent of the Legislature.

Justice CAVANAGH, dissenting, stated that today's decision does not "restore[] judicial legitimacy by overruling decisions that wrongly usurped the power of the Legislature." To suggest that legitimacy has been restored is to suggest that legitimacy had been lost. It is only necessary to review the decisions cast aside by this decision to discover that they were firmly rooted in the law. Although the concurrence provides an explanation for the Court's recent overrulings, it provides no justification. Further, it is unclear exactly how the concurring opinion relates to the merits of the present cases. This is the time to decide the issues argued.

*Pearlman & Pianin* (by *Michael Pianin* and *Sheryl R. Lederman*) for the plaintiff-appellant in *Robinson*.

*Frederic M. Rosen* for plaintiffs Cooper.

*Bendure & Thomas* (by *Mark R. Bendure*) for plaintiffs Morris.

*Plunkett & Cooney, P.C.* (by *Mary Massaron Ross* and *Laurel F. McGiffert*), for the defendants.

Amici Curiae:

*Garan, Lucow, Miller & Seward, P.C.* (by *Rosalind Rochkind*), for Michigan Municipal League Legal Defense Fund and Michigan Municipal Liability and Property Pool.

TAYLOR, J. In these consolidated cases we are required yet again to consider the parameters of civil liability for governmental agencies and police officers when a police chase results in injuries or death to a person other than the driver of the fleeing vehicle. More specifically, the question in these cases is whether the city of Detroit or individual police officers face civil liability for injuries sustained by passengers in vehicles fleeing from the police when the fleeing car caused an accident. As explained below, we hold that defendants are entitled to judgment as a matter of law.

First, we hold that the police owe a duty to innocent passengers, but owe no duty to passengers who are themselves wrongdoers whether they help bring about the pursuit or encourage flight. A passenger who seeks to recover for injuries allegedly caused by a negligent police pursuit bears the burden of proving personal innocence as a precondition to establishing the duty element of a cause of action. Because the record does not allow us to conclude as a matter of law whether plaintiffs were innocent as a matter of law,[1] we are required to address additional grounds

---

[1] As noted in footnote 6, there was some evidence suggesting that Henderson was not innocent. However, because the test we announce is new, and Henderson's estate was never on notice of its obligation to produce any evidence to the contrary, we take the more prudent course and decline to find as a matter of law that Henderson was a wrongdoer.

on which defendants assert they are entitled to prevail.

Second, we hold that the city of Detroit is entitled to judgment as a matter of law because one cannot reasonably conclude under a narrow reading of the motor vehicle exception to governmental immunity, MCL 691.1405; MSA 3.996(105), that plaintiffs' injuries resulted from the operation of the police vehicles. We agree with *Fiser v Ann Arbor*, 417 Mich 461; 339 NW2d 413 (1983), that an officer's physical handling of a motor vehicle during a police chase, can constitute "negligent operation . . . of a motor vehicle" within the motor vehicle exception. However, plaintiffs' injuries did not, as a matter of law, result from the operation of the police cars where the police cars did not hit the fleeing car or physically cause another vehicle or object to hit the vehicle that was being chased or physically force the vehicle off the road or into another vehicle or object.[2] Thus, we overrule *Fiser* and *Rogers v Detroit*, 457 Mich 125; 579 NW2d 840 (1998). Contrary to *Rogers*, we also hold that an officer's decision to pursue does not constitute the negligent operation of a motor vehicle.

Third, we conclude the individual police officers are immune from liability because their actions were not "the proximate cause" of the plaintiffs' injuries. Thus, we overrule *Dedes v Asch*, 446 Mich 99; 521 NW2d 488 (1994), and hold that the phrase "the proximate cause" as used in the employee provision of the

---

[2] Conversely, if an innocent person is injured as a result of a police chase because a police car physically forces a fleeing car off the road or into another vehicle or object, such person may seek recovery against a governmental agency pursuant to the motor vehicle exception to governmental immunity and also against the officer operating the police vehicle if the individual police officer is "the proximate cause" of the accident.

governmental immunity act, MCL 691.1407(2); MSA 3.996(107)(2), means the one most immediate, efficient, and direct cause preceding an injury, not "a proximate cause." Because the conduct of the individual police officers in these cases were not "the proximate cause," i.e., the one most immediate, efficient, and direct cause, of the passengers' injuries, the officers are entitled to governmental immunity.

### I. REVIEW OF OUR CASE LAW

Our first opinion addressing police chase liability was *Fiser, supra,* where this Court considered a lawsuit filed by a plaintiff who was injured when his car was hit by a car driven by someone who was fleeing the police. The plaintiff sued the city of Ann Arbor and the police officers involved in the chase. The trial court granted summary disposition to the city and the police officers. The Court of Appeals affirmed.[3] This Court reversed with respect to the city and two of the police officers, holding that the excessive speed of the fleeing vehicle could be said to have resulted from the fact that the driver was being pursued by the police and that it was this high speed that caused the fleeing driver to lose control. *Id.* at 475. The Court further held that the issues of negligence and proximate causation of his injuries was for the jury. *Id.*

More recently in *Rogers, supra,* we considered two consolidated police chase cases. Both cases involved car chases in which the fleeing vehicle crashed into vehicles occupied by innocent parties. The defendants

---

[3] 107 Mich App 367; 309 NW2d 552 (1981).

argued that the conduct of the police officers could not be a proximate cause of the injuries. The majority held that it was for the factfinder to determine whether the actions of the police officers in operating the pursuing vehicles were causes in fact of the plaintiff's injuries, i.e., the jury could effectively conclude that the police were causing the flight. *Id.* at 129. The *Rogers* majority reaffirmed *Fiser* and expanded on it by holding that the municipal defendants could be held liable for their officer's decision to commence pursuit or to continue the pursuit. *Id.* at 143-145.

Thus, pursuant to *Fiser*, police officers face a conundrum wherein they have a sworn duty to apprehend suspected lawbreakers yet simultaneously face legal liability if anyone but the fleeing driver is injured when they give chase. Under *Fiser* this liability is imposed even where the police car does not hit the fleeing car or physically cause another vehicle or object to hit the fleeing car or physically force the fleeing car off the road or into another vehicle or object. Pursuant to *Rogers*, even more remarkably, liability may attach for the mere decision to give chase to a suspected lawbreaker.

## II. FACTS AND LOWER COURT PROCEEDINGS

In *Cooper*, plaintiffs Marlon Cooper and Martell Morris, both fourteen years of age, were passengers in a stolen Jeep Cherokee driven by Damian Collins, who was also fourteen years old. The Detroit police initially noticed that Damian Collins appeared too young to drive and that the Jeep's steering column was broken. The officers, who were in a partially marked police car, attempted to stop Collins by turning on their car's lights, briefly using the siren, show-

ing Collins a police badge, and instructing him to pull
over. Instead of stopping, Collins sped away. The
police pursued him. After a chase through a residen-
tial neighborhood, Collins crashed the Jeep he was
driving into a house. Collins was killed, while Cooper
and Morris were seriously injured.

The parents of Cooper and Morris filed a lawsuit[4]
against the individual officers and the city of Detroit.
The defendants moved for summary disposition under
MCR 2.116(C)(7), (8), and (10). After argument, the
trial court granted summary disposition for both the
officers and the city. The trial court held that the
officers were entitled to governmental immunity
because plaintiffs had failed to state a claim in avoid-
ance of the employee provision of the governmental
immunity act. The trial court also concluded the
officers owed no duty to plaintiffs. The trial court fur-
ther held that the city was entitled to governmental
immunity because the plaintiffs had failed to state a
claim within the motor vehicle exception.

The Court of Appeals reversed, holding that the
officers were not entitled to governmental immunity
because plaintiffs' claims avoided the employee provi-
sion of the governmental immunity act and also that
the officers owed a duty to plaintiffs.[5] The Court of
Appeals also held that the city was not entitled to
governmental immunity because plaintiffs' claims fell
within the motor vehicle exception.

In *Robinson*, Courtney Henderson, age fifteen, was
walking to his summer job when neighbor Marcelle

---

[4] Plaintiffs also brought a lawsuit against the personal representative of
the estate of Damian Collins. However, that lawsuit is not before us.

[5] 218 Mich App 649; 554 NW2d 919 (1996).

Blakeney offered him a ride. Henderson sat in the back seat; Marlon Smith, age eighteen, was in the front passenger seat. The Detroit police observed Blakeney weaving from lane to lane. When the police activated the lights on their police car, Blakeney began to flee rather than stop. The police turned on the siren and began to pursue the vehicle. This pursuit ended when Blakeney's car collided with a nonpolice vehicle. Henderson died in the accident.

Plaintiff, as personal representative for Henderson's estate, filed a lawsuit against the city of Detroit and the police officers involved in the pursuit. Defendants filed a motion for summary disposition under MCR 2.116(C)(7), (8) and (10). The trial court granted defendants' motion for summary disposition. The trial court ruled that the officers were entitled to governmental immunity because plaintiff had failed to state a claim in avoidance of the employee provision of the governmental immunity act. The trial court also held the officers owed no duty to Henderson. The trial court ruled that the city was not entitled to governmental immunity because plaintiff's claim fell within the motor vehicle exception. The trial court nevertheless concluded that summary disposition in the city's favor was proper in light of its duty ruling.

After a conflict panel was convened, the Court of Appeals ultimately affirmed, holding that the police owe no duty to a voluntary passenger in a fleeing driver's vehicle.[6]

---

[6] 225 Mich App 14; 571 NW2d 34 (1997). The three-judge panel in *Robinson* originally issued an opinion on September 10, 1996, affirming the judgment of the trial court and holding that no duty is owed to a passenger voluntarily in a fleeing car. 220 Mich App 801, 803; 561 NW2d 390 (1996). The *Robinson* panel then granted rehearing on its own motion to review the apparent conflict between this decision and that of *Cooper v*

This Court granted leave in both *Robinson*[7] and *Cooper*[8] and ordered the cases to be submitted together. After oral argument, we set the case over to the present term and asked the parties to file additional briefing regarding whether *Fiser*, *Rogers*, and *Dedes* were properly decided.[9]

### III. THE QUESTION OF DUTY

In *Fiser*, *supra* at 469-473, this Court implicitly held, in the context of a police pursuit, that the police owe a duty to innocent bystanders. In *Jackson v Oliver*, 204 Mich App 122, 126-127; 514 NW2d 195 (1994), the Court of Appeals distinguished *Fiser* and held that in the context of a police pursuit the police do not owe the fleeing suspect, i.e., a wrongdoer, a duty to refrain from chasing the suspect at speeds dangerous to the suspect. The *Jackson* panel's holding was premised on public policy:

---

*Wade*, which was released fifteen minutes before its decision in *Robinson*. *Id.* at 801. On rehearing, the *Robinson* panel, concluded that it was compelled to follow *Cooper* and reversed the judgment of the trial court holding that "a duty was owed the present decedent despite the fact that he made obscene gestures to the police and encouraged the flight that led to his death." *Id.* at 802. The Court of Appeals then convened a special panel to resolve the conflict between *Cooper* and *Robinson*. *Id.* at 801.

[7] 458 Mich 861 (1998).

[8] 456 Mich 905 (1997).

[9] 461 Mich 1201 (1999). This Court has been urged to revisit *Fiser* on several occasions. See, e.g., *Frohman v Detroit*, 181 Mich App 400, 413-415; 450 NW2d 59 (1989) ("We invite the Supreme Court or Legislature to establish a bright line test"); *Ewing v Detroit (On Remand)*, 214 Mich App 495, 499-500; 543 NW2d 1 (1995) ("I urge our Supreme Court to reconsider *Fiser*," opinion of DOCTOROFF, C.J.), aff'd 457 Mich 125; 579 NW2d 840 (1998); *Cooper v Wade*, 218 Mich App 649, 663; 554 NW2d 919 (1996) ("I concur but suggest this area of the jurisprudence of this state should be revisited by the Supreme Court," concurring opinion by MICHAEL J. KELLY, J.). It is also the case that *Dedes* and *Rogers* were decided over vigorous three-justice dissents.

> Out of concern for public safety, police must sometimes allow fleeing suspects to get away. However, it would be absurd to conclude that the police, out of concern for the safety of a fleeing criminal suspect, must cease pursuit of the fleeing suspect or risk possible civil liability. [*Id.* at 126.]

The cases at bar concern a scenario not considered in either *Fiser* or *Jackson*, i.e., whether the police owe a duty to a passenger in a fleeing vehicle. The Court of Appeals in *Cooper* held that the police had a duty to passengers, while the conflict panel in *Robinson* resolved this issue consistently with *Jackson*, holding that the police do not owe a duty to passengers in a fleeing driver's vehicle.

We conclude that it is irrelevant whether a wrongdoer is a driver or a passenger or whether an innocent person is inside or outside the vehicle. Consistent with the reasoning in *Fiser* and *Jackson*, whatever their location, there is a duty to innocent persons, but not to wrongdoers. In other words, the police owe a duty to innocent persons whether those persons are inside or outside the vehicle. Conversely, the police owe no duty to a wrongdoer, whether the wrongdoer is the fleeing driver or a passenger.

Our conclusion that police officers giving chase owe a duty to innocent persons is consistent with the statutes governing operation of emergency vehicles. MCL 257.603(3)(c); MSA 9.2303(3)(c) authorizes emergency vehicles to exceed prima facie speed limits, but only as long as "life or property" is not endangered. Similarly, MCL 257.632; MSA 9.2332 exempts police officers from speed limits when chasing violators of the law, but does not exempt the police from the consequences of a "reckless disregard of the safety of others." Further, MCL 257.653; MSA 9.2353,

which requires drivers to pull over upon the approach of an emergency vehicle with flashing lights, specifically states that the statute does not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of persons using the highway.

The statutory references to endangering life and the safety of others demonstrates that the Legislature has placed a duty upon police officers toward innocent persons when they are giving chase.[10]

We place on the plaintiff the burden of proving that a passenger was an innocent person and that the police therefore owed the passenger a duty. Where no genuine issue of material fact exists regarding the status of a passenger, summary disposition may be appropriate. However, when a genuine issue of material fact exists concerning whether a passenger is innocent or a wrongdoer, and thus whether the police owed a duty, the question is appropriately resolved by the trier of fact. See, e.g., *Holland v Liedel*, 197 Mich App 60, 65; 494 NW2d 772 (1992) (although the issue whether a duty exists is generally a question of law for the court to decide, where the determination of duty depends on factual findings, those findings must be made by the jury). In the cases at bar, the issue of the passengers' status has not been sufficiently devel-

---

[10] One might even argue that these statutes create a duty toward a fleeing driver. We need not reach that question, but do note that, even if such a duty were found to exist, a fleeing driver would nevertheless be barred from seeking to recover for injuries sustained while attempting to evade a lawful order to stop his vehicle under Michigan's wrongful conduct rule. This rule is rooted in the public policy that courts should not lend their aid to plaintiffs whose cause of action is premised on their own illegal conduct. *Orzel v Scott Drug Co*, 449 Mich 550; 537 NW2d 208 (1995). Culpable passengers have no greater claim to benefit from the wrongful conduct than does the driver.

oped, thereby making summary disposition on the basis of duty inappropriate at this time. Thus, we turn to consideration of defendants' additional defenses.

### IV. THE MOTOR VEHICLE EXCEPTION TO GOVERNMENTAL IMMUNITY

Plaintiffs contend the city of Detroit may be liable pursuant to the motor vehicle exception to governmental immunity. This statute provides in relevant part as follows:

> Governmental agencies shall be liable for bodily injury and property damage resulting from the negligent operation by any officer, agent, or employee of the governmental agency, of a motor vehicle of which the governmental agency is owner . . . . [MCL 691.1405; MSA 3.996(105).]

In *Fiser, supra* at 469, this Court held that a police officer's pursuit of a fleeing vehicle could fall within the motor vehicle exception as the "negligent operation of a motor vehicle." The Court so held even where the police vehicle did not hit the fleeing car or physically cause another vehicle or object to hit the fleeing car or physically force the fleeing car off the road or into another vehicle or into some other object.

In *Rogers, supra* at 145-146, the majority went beyond *Fiser* and concluded that negligent operation of a motor vehicle encompasses not only the pursuit itself, but also a police officer's decision to commence a pursuit. The dissent would have held that the phrase "negligent operation of a motor vehicle" encompasses the manner in which a police vehicle is driven during a pursuit, but does not encompass an

officer's decision to pursue a fleeing vehicle. *Id.* at 158-161 (Taylor, J., with Weaver, J., concurring).

As indicated in footnote 9, we have been asked on numerous occasions to revisit *Fiser*. See, e.g., *Frohman v Detroit*, 181 Mich App 400, 414-415; 450 NW2d 59 (1989):

> When a situation occurs, such as in the instant case, where an officer performs his legal duty by attempting to catch a fleeing lawbreaker, conducts the pursuit in what one may minimally call a negligent manner, and does not strike any vehicle with his vehicle, it is a remarkable legal principle that he can be said to have "caused" the resultant accident. To prevent the accident, all the fleeing driver need have done is stop. For the law to incorporate the presumption that a person will violate the law and to thereby hold that the officer's pursuing the violator is a proximate cause of an accident involving the fleeing person makes society the insurer of a risk no private corporation is required to assume under the law. Furthermore, the ordinary person in society has no such obligation or even a right to pursue such a lawbreaker, whereas a police officer has.
>
> We conclude that in police pursuit cases an initial legal decision should be made to determine whether the nature of the pursuit is such as to create a question which must be submitted to a jury. We invite the Supreme Court or Legislature to establish a bright line test which provides that a decision to engage in pursuit, as a matter of law, cannot be the basis of a claim of negligence. Only when the officer's driving itself is a direct cause of an injury would the question of negligence be submitted as a fact question to the jury. The determination should not turn on how the officer was conducting the pursuit but rather on what effect the manner in which the officer drove his vehicle had on the cause of the accident. *Fiser*'s legal fiction, that a police pursuit of a lawbreaker should give rise to a legal expectation the lawbreaker will flee, should be re-examined, especially in light of *Ross* [*v Consumers Power Co (On Rehearing)*, 420 Mich 567; 363 NW2d 641 (1984)] . . . .

We begin our analysis with the basic principle, of which there is no longer any dispute, that the grant of immunity in MCL 691.1407(1); MSA 3.996(107)(1)[11] is broad and that the statutory exceptions[12] thereto are to be narrowly construed. *Kerbersky v Northern Mich Univ*, 458 Mich 525, 529; 582 NW2d 828 (1998); *Horace v City of Pontiac*, 456 Mich 744, 749 ff; 575 NW2d 762 (1998); *Wade v Dep't of Corrections*, 439 Mich 158, 166; 483 NW2d 26 (1992).

In this regard, we note that *Fiser* was decided before this Court's seminal governmental immunity opinion in *Ross v Consumers Power Co, supra*, where we held that statutory exceptions to governmental immunity are to be narrowly construed. Previously, of course, this Court had given the exceptions broad readings. As explained in *Horace v City of Pontiac*, two cases decided by this Court before *Ross* that had given a broad reading to the defective public building exception to governmental immunity were no longer good law once *Ross* determined that statutory exceptions were to be narrowly construed. *Id.* at 750, n 3. *Fiser* meets a similar fate. *Fiser* may have been proper when decided, but it is no longer "good law" after *Ross*. Contrary to *Ross*, *Fiser* requires a broad reading of the motor vehicle exception to conclude

---

[11] This statute provides in pertinent part as follows:

Except as otherwise provided in this act, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function.

[12] The other four statutory exceptions are maintenance of public highways, MCL 691.1402; MSA 3.996(102), performance of proprietary functions by government entities, MCL 691.1413; MSA 3.996(113), the public building exception, MCL 691.1406; MSA 3.996(106), and the governmental hospital exception, MCL 691.1407(4); MSA 3.996(107)(4).

that a police vehicle, merely by the fact of pursuit, proximately caused a subsequent accident when the police vehicle did not hit the fleeing car or force it off the roadway or into another vehicle or object.

In *Robinson*, the plaintiff alleged that the city was negligent "through the conduct of one or more of its police officer employees in failing to operate the police vehicle at all times in such manner as to avoid placing the general public in danger . . . ." In *Cooper*, plaintiffs alleged that the city was liable because the pursuing officer "[f]ailed and neglected to operate the vehicle owned by Defendant city of Detroit in a safe, prudent and reasonable manner at all times and to obey all traffic laws and regulations." Notably absent from the plaintiffs' allegations is the assertion that the police vehicles hit the fleeing car or otherwise physically forced the fleeing car off the road or into another vehicle or object.

The motor vehicle exception requires that a plaintiff's injuries result from the operation of a government vehicle. MCL 691.1405; MSA 3.996(105). Because there is no case law that has previously examined the phrase "resulting from" we turn to the dictionary.[13] The *American Heritage Dictionary, Second College Ed*, p 1054, defines "result" as: "To occur or exist as a consequence of a particular cause[;] To end in a particular way[;] The consequence of a particular action, operation or course; outcome." Given

---

[13] It is appropriate to consult a lay dictionary when defining common words or phrases that have not acquired a unique meaning at law because "the common and approved usage of a nonlegal term is most likely to be found in a standard dictionary and not a legal dictionary." *Horace v City of Pontiac, supra* at 756. See also *Consumers Power Co v Public Service Comm*, 460 Mich 148, 163, n 10; 596 NW2d 126 (1999), and MCL 8.3a; MSA 2.212(1).

the fact that the motor vehicle exception must be narrowly construed, we conclude that plaintiffs cannot satisfy the "resulting from" language of the statute where the pursuing police vehicle did not hit the fleeing car or otherwise physically force it off the road or into another vehicle or object.[14]

We also agree with the dissenting opinion in *Rogers* that the decision to pursue a fleeing motorist, which is separate from the operation of the vehicle itself, is not encompassed within a narrow construction of the phrase "operation of a motor vehicle."[15] Further, allowing a police officer's decision to pursue to be construed as the "operation of a motor vehicle" and therefore fall under an exception to governmental immunity, conflicts with the police officer's duty to apprehend criminal suspects. The officer should be able to rely on MCL 257.602a; MSA 9.2302(1) and MCL 257.653; MSA 9.2353, which mandate that a motorist not wilfully fail to obey a police officer's direction to stop. We thus reject the holding in *Rogers* that a police officer's decision to pursue a fleeing

---

[14] The dissent suggests that there should be liability where a police vehicle forces an innocent intervening car to hit the fleeing vehicle causing injury to an innocent person in the fleeing vehicle. However, we do not believe that such a scenario would fit within a narrow reading of the statutory requirement of "resulting from." The dissent's position would be more in accord with a proximate cause "but for" analysis. However, the statute does not say that governmental agencies are liable for injuries or property damage "proximately caused" by the negligent operation of a motor vehicle. Rather, the statute says the injuries or property damage must result from the negligent operation of a motor vehicle. Because the Legislature did not utilize proximate cause language, we will not import such an analysis here.

[15] The decision to give chase is not the operation of a motor vehicle, just as an inebriated person's decision to drive drunk is not a crime. Only when the decision is translated into driving can there be the operation of a motor vehicle or the commission of the crime of driving while under the influence of alcohol.

vehicle falls within the motor vehicle exception to governmental immunity.

### V. THE EMPLOYEE PROVISION OF THE GOVERNMENTAL IMMUNITY ACT

The plaintiffs also sued the individual police officers, seeking to hold them personally liable. The tort liability of governmental employees is governed by the employee provision of the governmental immunity act, which states in pertinent part:

> Each . . . employee of a governmental agency . . . shall be immune from tort liability for injuries to persons or damages to property caused by the . . . employee . . . while in the course of employment . . . while acting on behalf of a governmental agency if all of the following are met:
>
> (a) The . . . employee . . . is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The . . . employee's . . . conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results. [MCL 691.1407(2); MSA 3.996(107)(2).]

There is no question that (a) and (b) are met in both of these cases. As to subsection (c), in *Dedes*, *supra* at 107, this Court effectively interpreted "the proximate cause" in subsection (c) to mean "a proximate cause." The Court further explained that "the" proximate cause does not mean "sole" proximate cause. *Id.* We overrule *Dedes* to the extent that it interpreted the phrase "the proximate cause" in subdivision (c) to mean "a proximate cause." The Legisla-

ture's use of the definite article "the" clearly evinces an intent to focus on one cause. The phrase "the proximate cause" is best understood as meaning the one most immediate, efficient, and direct cause preceding an injury.

Because the Legislature is presumed to understand the meaning of the language it enacts into law, statutory analysis must begin with the wording of the statute itself. *Carr v General Motors Corp*, 425 Mich 313, 317; 389 NW2d 686 (1986). Each word of a statute is presumed to be used for a purpose, and, as far as possible, effect must be given to every clause and sentence. *Univ of Mich Bd of Regents v Auditor General*, 167 Mich 444, 450; 132 NW 1037 (1911). The Court may not assume that the Legislature inadvertently made use of one word or phrase instead of another. *Detroit v Redford Twp*, 253 Mich 453, 456; 235 NW 217 (1931). Where the language of the statute is clear and unambiguous, the Court must follow it. *City of Lansing v Lansing Twp*, 356 Mich 641, 649; 97 NW2d 804 (1959).

These rules of statutory construction are especially germane in the cases now before us because Michigan strictly construes statutes imposing liability on the state in derogation of the common-law rule of sovereign immunity. *Johnson v Ontonagon Co Bd of Co Rd Comm'rs*, 253 Mich 465, 468; 235 NW 221 (1931); *Detroit v Putnam*, 45 Mich 263, 265; 7 NW 815 (1881). This Court has repeatedly acknowledged that governmental immunity legislation "evidences a clear legislative judgment that public and private tortfeasors should be treated differently." *Ross* at 618.

The majority in *Dedes* interpreted the phrase "the proximate cause" to mean "a proximate cause." It did

this on the basis of an analysis that not to do so
would produce a marked change in Michigan law, and
that the Legislature, in its "legislative history," gave
no indication that it understood that it was making
such a significant change. This approach can best be
described as a judicial theory of legislative befuddle-
ment. Stripped to its essence, it is an endeavor by the
Court to use the statute's "history" to contradict the
statute's clear terms. We believe the Court had no
authority to do this. After all, the judiciary has always
adhered to the principle that the Legislature, having
acted, is held to know what it has done, i.e., to know
the difference between "a proximate cause" and "the
proximate cause." Yet, in this circumstance, it is not
necessary to rely on theoretical surmises to conclude
this, as the Legislature has shown an awareness that
it actually knows that the two phrases are different. It
has done this by utilizing the phrase "a proximate
cause" in at least five statutes[16] and has used the
phrase "the proximate cause" in at least thirteen
other statutes.[17] Given such a pattern, it is particularly
indefensible that the *Dedes* majority felt free to read
"the proximate cause" as if it said "a proximate
cause." The error will not be compounded, as today

----

[16] See MCL 436.1801(3);   MSA 18.1175(801)(3), MCL 600.2947(6)(a);
MSA   27A.2947(6)(a),   MCL   600.6304(8);   MSA   27A.6304(8),   MCL
691.1665(a); MSA 12.418(5)(a), and MCL 750.145o; MSA 28.342A(o).

[17] See MCL 257.633(2);   MSA 9.2333(2), MCL 324.5527; MSA 13A.5527,
MCL 324.5531(11); MSA 13A.5531(11), MCL 324.5534; MSA 13A.5534, MCL
418.375(2);   MSA   17.237(375)(2),   MCL   500.214(6);   MSA   24.1214(6),   MCL
600.2912b(4)(e);   MSA   27A.2912(2)(4)(e),   MCL   600.2912b(7)(d);   MSA
27A.2912(2)(7)(d),   MCL   600.2912d(1)(d);   MSA   27A.2912(4)(1)(d),   MCL
600.2947(3);   MSA   27A.2947(3),   MCL   600.5839(1);   MSA   27A.5839(1),   MCL
691.1407(2)(c); MSA 3.996(107)(2)(c), and MCL 750.90e; MSA 28.285e.

this Court corrects the flawed analysis of the *Dedes* majority.[18]

Nevertheless, the fact that the Legislature sometimes uses "a proximate cause" and at other times uses "the proximate cause" does not, of course, answer the question what "the proximate cause" means other than to show that the two phrases should not be interpreted the same way. Our duty is to give meaning to the Legislature's choice of one word over the other.

We agree with the following analysis found in the dissent in *Hagerman v Gencorp Automotive*, 457 Mich 720, 753-754; 579 NW2d 347 (1998):

> Traditionally in our law, to say nothing of our classrooms, we have recognized the difference between "the" and "a." "The" is defined as "definite article. 1. (used, esp. before a noun, with a specifying or particularizing effect, as opposed to the indefinite or generalizing force of the indefinite article a or an) . . . ." *Random House Webster's College Dictionary*, p 1382. Further, we must follow these distinctions

---

[18] The dissent claims our construction of the word "the" ignores MCL 8.3b; MSA 2.212(2), which states:

> Every word importing the singular number only may extend to and embrace the plural number, and every word importing the plural number may be applied and limited to the singular number.

We disagree. First, the statute only states that a word importing the singular number "may extend" to the plural. The statute does not say that such an automatic understanding is required. Moreover, MCL 8.3; MSA 2.212 provides that the rule stated in § 3b shall be observed "unless such construction would be inconsistent with the manifest intent of the Legislature." Second, the Legislature has directed that

> [a]ll words and phrases shall be construed and understood according to the common and approved usage of the language . . . . [MCL 8.3a; MSA 2.212(1).]

There is no indication that the words "the" and "a" in common usage meant something different at the time this statute was enacted.

between "a" and "the" as the Legislature has directed that
"[a]ll words and phrases shall be construed and understood
according to the common and approved usage of the lan-
guage . . . . MCL 8.3a; MSA 2.212(1). Moreover, there is
no indication that the words "the" and "a" in common usage
meant something different at the time this statute was
enacted . . . .

Further, recognizing that "the" is a definite article,
and "cause" is a singular noun, it is clear that the
phrase "the proximate cause" contemplates *one*
cause. Yet, meaning must also be given to the adjec-
tive "proximate" when juxtaposed between "the" and
"cause" as it is here. We are helped by the fact that
this Court long ago defined "the proximate cause" as
"the immediate efficient, direct cause preceding the
injury." *Stoll v Laubengayer*, 174 Mich 701, 706; 140
NW 532 (1913). The Legislature has nowhere abro-
gated this, and thus we conclude that in MCL
691.1407(2)(c); MSA 3.996(107)(2)(c) the Legislature
provided tort immunity for employees of governmen-
tal agencies unless the employee's conduct amounts
to gross negligence that is the one most immediate,
efficient, and direct cause of the injury or damage,
i.e., the proximate cause.

Applying this construction to the present cases, we
hold that the officers in question are immune from
suit in tort because their pursuit of the fleeing vehi-
cles was not, as a matter of law, "the proximate
cause" of the injuries sustained by the plaintiffs. The
one most immediate, efficient, and direct cause of the
plaintiffs' injuries was the reckless conduct of the
drivers of the fleeing vehicles.[19]

---

[19] We recognize that our proximate cause analysis with respect to indi-
vidual police officers is inconsistent with that found in *Fiser*. However,

Accordingly, summary disposition for the defendant officers was proper because reasonable jurors could not find that the officers were "the proximate cause" of the injuries. *Moll v Abbott Laboratories*, 444 Mich 1, 28, n 36; 506 NW2d 816 (1993).

### VI. STARE DECISIS

In overruling *Fiser/Rogers* and *Dedes* we have given serious consideration to the doctrine of stare decisis.[20] Stare decisis is generally "the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process."[21] However, stare decisis is not to be applied mechanically to forever prevent the Court from overruling earlier erroneous decisions determining the meaning of statutes.[22]

---

the employee provision of the governmental immunity act, which requires the governmental actor to be "the proximate cause," was enacted three years after *Fiser* was decided as part of 1986 PA 175. Thus, the *Fiser* Court was not restricted by the statute as are we. The dissent's broad statement that we are rejecting the *Fiser* Court's proximate cause analysis is in error. As previously explained, the Legislature changed *Fiser*'s proximate cause analysis with respect to the individual police officers when it enacted the employee provision of the governmental immunity act.

[20] Stare decisis means "To abide by, or adhere to, decided cases." Black's Law Dictionary (rev 4th ed), p 1577.

[21] *Hohn v United States*, 524 US 236, 251; 118 S Ct 1969; 141 L Ed 2d 242 (1998).

[22] *Holder v Hall*, 512 US 874, 944; 114 S Ct 2581; 129 L Ed 2d 687 (1994). It is also the case that "this Court will not close its eyes to a possible error it may have committed in the past." *Wilson v Doehler-Jarvis*, 358 Mich 510, 514; 100 NW2d 226 (1960). Moreover, this Court has no obligation to perpetuate error simply because it may have reached a wrong result in one of its earlier decisions. Thus, the doctrine of stare decisis does not tie the law to past, wrongly decided cases solely in the interest of stability and continuity.

Courts have cited numerous factors to consider before overruling a prior case. For example, *Helvering v Hallock*, 309 US 106, 119; 60 S Ct 444; 84 L Ed 604 (1940), states:

> [S]*tare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience.

We must also recognize that stare decisis is a "principle of policy" rather than "an inexorable command,"[23] and that the Court is not constrained to follow precedent when governing decisions are unworkable or are badly reasoned.[24]

Further, as Justice Powell stated concurring in *Mitchell v W T Grant Co*, 416 US 600, 627-628; 94 S Ct 1895; 40 L Ed 2d 406 (1974), "[i]t is thus not only our prerogative but also our duty to re-examine a precedent where its reasoning or understanding of the Constitution is fairly called into question."

Courts should also review whether the decision at issue defies "practical workability," whether reliance interests would work an undue hardship, and whether changes in the law or facts no longer justify the questioned decision. See, e.g., *Planned Parenthood of Southeastern Pennsylvania v Casey*, 505 US 833, 853-856; 112 S Ct 2791; 120 L Ed 2d 674 (1992).

The first question, of course, should be whether the earlier decision was wrongly decided. We believe the decisions at issue here were. As previously explained,

---

[23] *Hohn*, n 21 *supra* at 251.

[24] *Holder*, n 22 *supra* at 937.

we conclude that *Fiser* has fallen victim to a subsequent change in the law, that *Rogers* reflects a misunderstanding of the statute that establishes the motor vehicle exception to governmental immunity, and that *Dedes* misconstrued a plainly worded statute.

However, as this discussion makes clear, the mere fact that an earlier case was wrongly decided does not mean overruling it is invariably appropriate.[25]

---

[25] We reject the dissent's argument that *Fiser* should not be overruled because of legislative acquiescence. As we recently explained in *Donajkowski v Alpena Power Co*, 460 Mich 243, 261; 596 NW2d 574 (1999):

> If it has not been clear in our previous decisions, we wish to make it clear now: "legislative acquiescence" is a highly disfavored doctrine of statutory construction; sound principles of statutory construction require that Michigan courts determine the Legislature's intent from its words, not from its silence.

See further *Van Dorpel v Haven-Busch Co*, 350 Mich 135, 146; 85 NW2d 97 (1957) (VOELKER, J.):

> Now this beguiling doctrine of legislative assent by silence possesses a certain undeniable logic and charm. Nor are we oblivious to the flattery implicit therein; double flattery, in fact: flattery both to the profound learning and wisdom of the particular supreme court which has spoken, and flattery to a presumably alert and eagerly responsive State legislature. One pictures the legislators of our various States periodically clamoring and elbowing each other in their zeal to get at the pearls of wisdom embalmed in the latest decisions and advance sheets of their respective supreme courts— and thenceforth indicating their unbounded approval by a vast and permanent silence.
>
> Yet there are several dark shadows in this picture. For one, it suggests a legislative passion for reading and heeding the decisions of our supreme courts which we suspect may be scarcely borne out by the facts. For another, pushed too far such a doctrine suggests the interesting proposition that it is the legislatures which have now become the ultimate courts of last resort in our various States; that if they delay long enough to correct our errors those errors thus become both respectable and immutably frozen; and, finally, the larger and more dismal corollary that if enough people persist long enough in ignoring an injustice it thereby becomes just.

Rather, the Court must proceed on to examine the effects of overruling, including most importantly the effect on reliance interests and whether overruling would work an undue hardship because of that reliance.

The "practical workability" of *Fiser* has also been suspect. As set forth in footnote 9, the Court of Appeals has repeatedly questioned *Fiser*.

As to the reliance interest, the Court must ask whether the previous decision has become so embedded, so accepted, so fundamental, to everyone's expectations that to change it would produce not just readjustments, but practical real-world dislocations.[26] It is in practice a prudential judgment for a court.

We conclude that these cases have not become so embedded, accepted or fundamental to society's expectations that overruling them would produce significant dislocations. It is apparent that the fleeing drivers, as they sought to evade the police, were undoubtedly not aware of our previous case law, nor is it likely that they drove as they did in reliance on the theory that they or the person injured as a result of their fleeing might have recourse against the municipality or individual police officers. In fact, it seems incontrovertible that only after the accident would such awareness come. Such after-the-fact

---

[26] Cases that come to mind with regard to reliance that, even if wrongly decided, we might nevertheless decline to overrule could well be our recent ruling regarding term limits *Massey v Secretary of State*, 457 Mich 410; 579 NW2d 862 (1998), or this Court's initial advisory opinion with regard to automobile no-fault insurance. *In re Constitutionality of 1972 PA 294*, 389 Mich 441; 208 NW2d 469 (1973). What it is that singularizes these cases, even as with the United States Supreme Court's legal tender cases after the Civil War, see *Knox v Lee*, 79 US (12 Wall) 457; 20 L Ed 287 (1870), is that to overrule them, even if they were wrongfully decided, would produce chaos.

awareness does not rise to the level of a reliance interest because to have reliance the knowledge must be of the sort that causes a person or entity to attempt to conform his conduct to a certain norm before the triggering event. Such a situation does not exist here.

Further, it is well to recall in discussing reliance, when dealing with an area of the law that is statutory (which *Fiser/Rogers* and *Dedes* do), that it is to the words of the statute itself that a citizen first looks for guidance in directing his actions. This is the essence of the rule of law: to know in advance what the rules of society are. Thus, if the words of the statute are clear, the actor should be able to expect, that is, rely, that they will be carried out by all in society, including the courts. In fact, should a court confound those legitimate citizen expectations by misreading or misconstruing a statute, it is that court itself that has disrupted the reliance interest. When that happens, a subsequent court, rather than holding to the distorted reading because of the doctrine of stare decisis, should overrule the earlier court's misconstruction. The reason for this is that the court in distorting the statute was engaged in a form of judicial usurpation that runs counter to the bedrock principle of American constitutionalism, i.e., that the lawmaking power is reposed in the people as reflected in the work of the Legislature, and, absent a constitutional violation, the courts have no legitimacy in overruling or nullifying the people's representatives.[27] Moreover, not only

---

[27] In addition to this, at a very practical plane, we question whether anyone would reasonably have relied upon these controversial opinions, as they were decided with the narrowest of majorities. As was stated in *Sommers v City of Flint*, 355 Mich 655, 662; 96 NW2d 119 (1959):

does such a compromising by a court of the citizen's ability to rely on a statute have no constitutional warrant, it can gain no higher pedigree as later courts repeat the error.

In summary, we are compelled to overrule *Dedes* because our responsibility is to interpret the words of the Legislature and "*the* proximate cause" does not mean "*a* proximate cause," and because this distinction is critical in determining responsibility for the injuries suffered by passengers in fleeing vehicles. We are equally compelled to overrule *Rogers* because we do not believe that the phrase "operation of a motor vehicle" encompasses the mere decision itself by the police to pursue a fleeing suspect, as opposed to the specific conduct of the police during such pursuit. Finally, we believe it is necessary to overrule *Fiser* because a narrow reading of the phrase "bodily injury . . . resulting from the negligent operation of a motor vehicle" does not properly characterize a situation in which a police vehicle pursuing a fleeing suspect has neither hit the fleeing car nor physically forced the vehicle off the road or into another vehicle or object.

We return the law, as is our duty, to what we believe the citizens of this state reading these statutes at the time of enactment would have understood the motor vehicle exception to governmental immunity and the employee provision of the governmental immunity act to mean.

---

*Younglas* [*v City of Flint*, 345 Mich 576; 77 NW2d 84 (1956)] was decided too recently and by too close a margin to carry great weight under the doctrine of *stare decisis*.

CONCLUSION

Thus, the police owe a duty to innocent passengers and pedestrians but not to passengers who are engaged in encouraging or abetting the fleeing. If an innocent person is injured as a result of a police chase because the police physically force a fleeing car off the road or into another vehicle that person may seek recovery against a governmental agency pursuant to the motor vehicle exception to governmental immunity. Plaintiffs in the cases at bar do not have causes of action against the city of Detroit under this exception because the injuries did not result from the police physically hitting the fleeing car or physically causing another vehicle or object to hit the fleeing car or physically forcing the fleeing car off the road or into another vehicle or object.

Innocent persons who are injured as the result of police chases may sue an individual police officer only if the officer is "the proximate cause" of the accident, i.e., the one most immediate, efficient, and direct cause of the accident. Because the officers in the cases at bar were not "the proximate causes" of the injuries, the plaintiffs have no causes of action against the officers.

The result in *Robinson* is affirmed. *Cooper* is reversed.

WEAVER, C.J., and CORRIGAN, YOUNG, and MARKMAN, JJ., concurred with TAYLOR, J.

CORRIGAN, J. I concur with the majority opinion in all respects. I write separately to respond to the dis-

sent's claim that this Court's recent decisions reflect a
"casual disregard" for precedent.[1]

This Court has displayed a proper respect for judi-
cial restraint while discharging its weighty responsi-
bility to the people of Michigan to uphold the consti-
tution and laws. The rule of stare decisis is not an

---

[1] The dissent builds on a theme first expressed in this case in Justice
CAVANAGH's statement dissenting from the resubmission order. 461 Mich
1201-1204 (1999). He suggested that the actions of "the majority" evi-
denced a lack of judicial restraint. In support of this position, he identified
six opinions in which this Court allegedly disregarded the principle of
stare decisis: *Ritchie-Gamester v City of Berkley*, 461 Mich 73; 597 NW2d
517 (1999), *McDougall v Schanz/Sobran v McKendrick*, 461 Mich 15; 597
NW2d 148 (1999), *People v Carines*, 460 Mich 750; 597 NW2d 130 (1999),
*People v Lukity*, 460 Mich 484; 596 NW2d 607 (1999), *People v Borchard-
Ruhland*, 460 Mich 278; 597 NW2d 1 (1999), and *McCready v Hoffius*, 459
Mich 1235 (1999). The claims that the majority lacks respect for the doc-
trine of stare decisis are ill-founded and cannot withstand scrutiny.

In his dissenting statement, Justice CAVANAGH used former Justice
BRICKLEY, the senior member of the Court at that time, as a barometer of
principled decision making. In his words, Justice BRICKLEY brought to the
cases "unwavering objectivity and reason, unconstrained by any predeter-
mined notions." 461 Mich 1204, n 4. After distinguishing Justice BRICKLEY
in this manner, Justice CAVANAGH noted that Justice BRICKLEY had joined "a
few" of the opinions cited as examples of "the majority's" lack of restraint.
In fact, Justice BRICKLEY actually joined the majority opinion in five of the
six cases cited and concurred in the result in the sixth. *Lukity, supra* at
503 (BRICKLEY, J., concurring) ("I concur in the majority opinion, and write
separately to acknowledge its discussion of the proper standard for
reviewing whether error is harmless"); *McDougall, supra* at 37; *Carines,
supra* at 773; *Borchard-Ruhland, supra* at 295; *McCready, supra* at 1235-
1236; *Ritchie-Gamester, supra* at 95 (BRICKLEY, J., concurring). Justice
BRICKLEY's actual voting record undermines the veiled suggestion that a
new group of intemperate justices seized control of this Court after the
"ascendancy" of "the majority" on January 1, 1999. 461 Mich 1203.

Further, it is clear that the principle of stare decisis is inapplicable in
three of the six cases alleged to violate stare decisis. In *Carines, supra*,
we declined to follow *People v Vaughn*, 447 Mich 217; 524 NW2d 217
(1994), a plurality opinion that had no precedential force, in *Borchard-
Ruhland, supra*, we declined to follow dicta in an earlier case, and in
*McCready, supra*, in lieu of granting rehearing we remanded for further
argument of a constitutional issue that was not addressed in the lower
courts. It is axiomatic that principles of stare decisis do not apply to plu-
rality opinions, dicta from previous cases, or to cases considered anew on
motions for rehearing.

inexorable command. *People v Graves*, 458 Mich 476, 481; 581 NW2d 229 (1998). As the highest Court in this state, our responsibility is not limited to deciding issues of first impression. We need not simply render decisions and close our eyes to their ramifications.[2] *Wilson v Doehler-Jarvis*, 358 Mich 510, 514; 100 NW2d 226 (1960). Would those who equate activism with a willingness to correct error favor a body of law totally insulated from change? Or does the "judicial activist" label only attach to those who correct erroneous decisions that do not comport with the accuser's policy preference, whatever that policy may be?

In my experience, the justices of this Court struggle diligently to render principled decisions. The justices are not, however, infallible. Subsequent events and further reflection frequently reveal errors in the reasoning of an opinion or unforeseen consequences. In such cases, our responsibility demands that we reconsider the prior decision. See *Wilson, supra* at 514. "When it becomes apparent that the reasoning of an opinion is erroneous, and that less mischief will result from overruling the case rather than following it, it

---

[2] This willingness to reexamine precedent is actually an important component of the development of the common law. The common law is not immutable; rather, it is flexible and adaptable to changing conditions. *Bugbee v Fowle*, 277 Mich 485, 492; 269 NW 570 (1936). "[C]hanging conditions may give rise to new rights under the law, and, also, where the reason on which existing rules of the common law are founded ceases, the rules may cease to have application." *Beech Grove Investment Co v Civil Rights Comm*, 380 Mich 405, 430; 157 NW2d 213 (1968) (plurality opinion), quoting 15A CJS, Common Law, § 2, pp 43-44. In *Ritchie-Gamester v City of Berkley*, n 1 *supra*, we exercised our authority over the development of the common law and adopted reckless misconduct as the minimum standard of care for coparticipants in recreational activities.

becomes the duty of the court to correct it." *Graves, supra* at 481.

This Court has fulfilled its duty. In *People v Kazmierczak*, 461 Mich 411; 605 NW2d 667 (2000), for example, we overruled *People v Taylor*, 454 Mich 580; 564 NW2d 24 (1997), because *Taylor* misread and misapplied controlling United States Supreme Court Fourth Amendment jurisprudence. *Taylor* "confused the concept of probable cause and how it may be shown with the concept of search warrant exceptions and when they exist." *Kazmierczak, supra* at 420. To allow that fundamentally flawed two-year-old decision to stand would have violated the public interest because lower courts would have been compelled to dismiss legitimate criminal charges on the basis of a misapplication of United States Supreme Court precedent in the *Taylor* case.

Similarly, in *People v Lukity*, 460 Mich 484; 596 NW2d 607 (1999), we overruled *People v Gearns*, 457 Mich 170; 577 NW2d 422 (1998), because the *Gearns* test for harmless error clearly conflicted with MCL 769.26; MSA 28.1096. We acknowledged and corrected the clear error in *Gearns* because the statute controls judicial review of preserved, nonconstitutional error. *Lukity, supra* at 495. To allow *Gearns* to stand would have violated the public interest because it would have resulted in the reversal of valid criminal convictions in contravention of legislative policy.

Our decisions since January 1999 reflect our adherence to our respective oaths to support the constitution and faithfully discharge the duties of our office. Const 1963, art 11, § 1. To preserve the legitimacy of the judicial branch, this Court must not exceed the limits of its constitutional authority. I agree that too

rapid change in the law threatens judicial legitimacy, as it threatens the stability of any institution. But the act of correcting past rulings that usurp power properly belonging to the legislative branch does not threaten legitimacy. Rather, it restores legitimacy. Simply put, our duty to act within our constitutional grant of authority is paramount. If a prior decision of this Court reflects an abuse of judicial power at the expense of legislative authority, a failure to recognize and correct that excess, even if done in the name of stare decisis, would perpetuate an unacceptable abuse of judicial power.

In *McDougall v Schanz/Sobran v McKendrick*, 461 Mich 15; 597 NW2d 148 (1999), for instance, we were required to recognize the limits of our constitutional authority. Our prior decisions had "failed to consider the constitutionally required distinction between 'practice and procedure' and substantive law and thus overstated the reach of our rule-making authority." *Id.* at 29. Our duty to adhere to the constitution compelled us to reject our prior characterization of all statutes that resemble rules of evidence as relating solely to practice and procedure in favor of an analysis that distinguishes between procedural rules of evidence and evidentiary rules of substantive law. *Id.* at 30-31. We could not follow past precedent when to do so would exceed the scope of this Court's constitutional authority.

The present case likewise requires that we respect the constitutional division of powers between the Legislature and the judiciary. This Court has the authority to construe statutes, not to redraft them. This task can be difficult because the Legislature sometimes uses language that is reasonably suscepti-

ble to more than one meaning. This Court properly exercises its constitutional authority in construing such ambiguous statutes in light of their language and legislative purpose. When, however, under the guise of statutory construction, this Court ignores the language of the statute to further its own policy views, it wrongly usurps the power of the Legislature.

In her dissent in *Dedes v Asch*, 446 Mich 99, 123-124; 521 NW2d 488 (1994), Justice RILEY explained that this Court exceeds the limit of its constitutional authority when it substitutes its policy choice for that of the Legislature:

> If the Legislature acted unwisely in enacting the statute or failing to adequately debate its merits, the judiciary may not act to save the Legislature from its folly. As long as they do not violate the constitution, legislative controversies are to be resolved by the various democratic safeguards and checks in the constitution: ballot box, initiative, referendum, or constitutional amendment. The majority, however, stifles and denigrates these processes by reaching beyond the plain language of the act and crafting a new statute reflective of its sensibilities.

In my view, our decision today restores judicial legitimacy by overruling decisions that wrongly usurped the power of the Legislature.

KELLY, J. (*concurring in part and dissenting in part*). I agree with the majority's holding that "the police owe a duty to innocent passengers, but owe no duty to passengers who are themselves wrong-doers . . . ."[1] *Ante*, p 444. The majority recognizes correctly that the Legislature "has placed a duty upon

---

[1] Although no duty is owed to wrongdoers in a fleeing vehicle, it does not follow that summary disposition should be granted in a broad range of

police officers toward innocent persons when they are giving chase." *Ante,* p 452.

Unfortunately, my agreement with the majority ends there. Its attempt to move our law one step forward by overruling three established decisions leaves it, in my estimation, trailing three steps behind the times.

The majority overrules the proximate cause analysis of *Fiser v Ann Arbor,* 417 Mich 461; 339 NW2d 413 (1983), and *Rogers v Detroit,* 457 Mich 125; 579 NW2d 840 (1998). It holds that "an officer's decision to pursue does not constitute the negligent operation of a motor vehicle." *Ante,* p 445. Also, the majority overrules *Dedes v Asch,* 446 Mich 99; 521 NW2d 488 (1994). In so doing, it holds "that the phrase 'the proximate cause' as used in the employee provision of the governmental immunity act, MCL 691.1407(2); MSA 3.996(107)(2), means the one most immediate, efficient, and direct cause preceding an injury, not 'a proximate cause.' " *Ante,* pp 445-446.

The majority's decision to overrule three distinct, well-reasoned lines of cases is unparalleled. I am not alone in adjudging such casual regard for prior Michigan jurisprudence and the principles of stare decisis disheartening and unwarranted. One might perceive from the majority's review of the issues in *Fiser, Rogers,* and *Dedes,* that the outcome of this case turns simply on who had the better argument. It does not. The majorities' positions in those cases became the law of the land. As a consequence, the real question in this case is whether today's majority has justified

---

circumstances. At some point, a determination must be made whether wrongdoing occurred.

its decision with the extraordinary showing that this Court has consistently demanded before overruling precedent. In my view, the majority has not come close to making such a showing.

As aptly stated by Justice Marshall in another context:

The overruling of one of this Court's precedents ought to be a matter of great moment and consequence. Although the doctrine of stare decisis is not an "inexorable command," *Burnet v Coronado Oil & Gas Co*, 285 US 393, 405 [52 S Ct 443; 76 L Ed 815] (1932) (Brandeis, J., dissenting), this Court has repeatedly stressed that fidelity to precedent is fundamental to "a society governed by the rule of law," *Akron v Akron Center for Reproductive Health, Inc*, 462 US 416, 420 [103 S Ct 2481; 76 L Ed 2d 687] (1983). See generally *Patterson v McLean Credit Union*, 491 US 164, 172 [109 S Ct 2363; 105 L Ed 2d 132] (1989) ("[I]t is indisputable that stare decisis is a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon 'an arbitrary discretion.' The Federalist, No. 78, p 490 [H. Lodge ed. 1888] [A. Hamilton]"); *Appeal of Concerned Corporators of Portsmouth Savings Bank*, 129 NH 183, 227; 525 A2d 671, 701 (1987) (Souter, J., dissenting) ("[S]tare decisis . . . 'is essential if case-by-case judicial decision-making is to be reconciled with the principle of the rule of law, for when governing legal standards are open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results,'" quoting *Thornburgh v American College of Obstetricians and Gynecologists*, 476 US 747, 786-787 [106 S Ct 2169; 90 L Ed 2d 779] [1986] [White, J., dissenting]).

Consequently, this Court has never departed from precedent without "special justification." *Arizona v Rumsey*, 467 US 203, 212 [104 S Ct 2305; 81 L Ed 2d 164] (1984). Such justifications include the advent of "subsequent changes or development in the law" that undermine a decision's ration-

ale, *Patterson v McLean Credit Union, supra*, 491 US 173;
the need "to bring [a decision] into agreement with experi-
ence and with facts newly ascertained," *Burnet v Coronado
Oil & Gas Co, supra*, 285 US 412 (Brandeis, J., dissenting);
and a showing that a particular precedent has become a
"detriment to coherence and consistency in the law," *Pat-
terson v McLean Credit Union, supra*, 491 US 173. [*Payne
v Tennessee*, 501 US 808, 848-849; 111 S Ct 2597; 115 L Ed
2d 720 (1991) (Marshall, J., dissenting).][2]

The majority cannot convincingly assert that any of
these traditional scenarios for overruling precedent
applies to *Fiser, Rogers,* or *Dedes*. The evidence it
proffers in support of reversal is so feeble that it
strains credibility. What has changed since this Court
decided *Fiser, Rogers,* and *Dedes* is not the law, not
the circumstances, but the makeup of the Court,
itself.

I

In *Rogers v Detroit*, this Court revisited its decision
in *Fiser v Ann Arbor* and reaffirmed the principle
that a plaintiff may recover from the government for
injuries caused by individuals fleeing police officers.
The plaintiff must show that a police pursuit consti-
tuted negligent operation of a police vehicle. As evi-
denced by the differing opinions written by members
of this Court, the decision was arrived at after consid-

---

[2] In his dissenting statement accompanying the supplemental briefing
order in this case, Justice Cavanagh pointed out that *Rogers* was decided
only fourteen months ago:

Stare decisis, of course, is hardly a handcuff enfeebling us from
responding to the changes that inevitably occur over time. Such
time has, however, heretofore been measurable in years, rather
than months. [*Cooper v Wade*, 461 Mich 1201, 1201-1202 (1999).]

erable deliberation and debate. Now, a new majority
has decided that *Fiser* "has fallen victim to a subse-
quent change in the law, that *Rogers* reflects a misun-
derstanding of the statute that establishes the motor
vehicle exception to governmental immunity . . . ."
*Ante*, p 465.

The majority reasons that *Fiser* has not been good
law since 1984, when we decided *Ross v Consumers
Power Co (On Rehearing)*, 420 Mich 567; 363 NW2d
641 (1984). *Ross*, it concludes, requires a narrow
reading of the motor vehicle exception. *Ante*, p 455.

Contrary to the majority's position, *Fiser* did not
fall "victim to a subsequent change in the law."
Instead, it has fallen victim to a change in this Court.
In *Rogers*, we explicitly considered the defendants'
argument that *Fiser* was overruled sub silentio by
*Ross*, *supra*. We stated:

> The contention that *Fiser* was overruled misapprehends
> the meaning of *Ross*. The "discretionary/ministerial" test of
> *Ross* applied only to the common-law liability of individual
> employees, not to the statutory liability of governmental
> agencies. *Ross* held that neither that decision nor MCL
> 691.1407; MSA 3.996(107) detracts from a city's liability
> under MCL 691.1405; MSA 3.996(105), as applied to police
> pursuits in *Fiser. Ross*, *supra* at 591, 593-594, 620-622.
>
> We find that *Ross* could not and did not overrule *Fiser*.
> Thus, we conclude that *Fiser* remains good law in Michi-
> gan . . . . [*Rogers*, *supra* at 140-141.]

The majority adopts Justice TAYLOR's dissenting
opinion in *Rogers*. It now maintains that a police
officer's pursuit is comprised of two parts: 1) the
decision to pursue and 2) the officer's physical han-
dling of the vehicle.

In *Rogers*, we explicitly stated that the officer's decision to commence or continue a pursuit could provide a basis for a finding of liability under MCL 691.1405; MSA 3.996(105). *Id.* at 145-146. The decisions to pursue, to continue pursuit, and the officer's actions while pursuing are so intertwined that they provide a jury with no rational means of distinguishing among them.

The majority ignores the fact that an officer's decision to operate a vehicle at breakneck speed is made simultaneously with the continuing decision to pursue the suspect. Moreover, other investigative measures often can be used in preference to high speed pursuits.[3] Police officers should seriously consider these measures in the interest of avoiding the injury or death of innocent persons. It is sometimes better to let a suspect go than to endanger the lives of innocents.[4]

Although certain drivers operate their motor vehicles without careful thought, I doubt that the Legislature perceived that police officers routinely do so while in high speed pursuit through residential

---

[3] For example, there are instances when the officer could radio the dispatcher and request a roadblock. Other options include the use of air support and photographic evidence to identify the perpetrator. Allowing innocent victims of police chase auto crashes to recover from the state may encourage the further development of technology to apprehend fleeing felons. See note, *Cooling the hot pursuit: Toward a categorical approach*, 73 Ind L J 1277, 1293-1294 (1998).

[4] The facts of *Cooper* poignantly illustrate this point. Was it worth the life of fourteen-year-old Damian Collins merely to apprehend him and recover a stolen Jeep Cherokee? Likewise, is it not ludicrous to argue that, to protect the public from underage drivers, it was necessary to engage Collins in a high speed pursuit?

streets. Forcing the jury to sift through the wreckage
to find such a distinction defies practical workability.[5]

Likewise, the majority's assertion that "the 'result-
ing from' language" does not encompass injuries sus-
tained when the fleeing driver's vehicle is not hit or
otherwise forced off the road or into another vehicle
or object by the pursuing police vehicle challenges
common sense. *Ante*, p 457. It illustrates how the
majority ignores the factual complexities underlining
police chases.

For example, the majority's premise fails to take
into consideration a situation in which a police car
forces an innocent intervening car to "hit" the fleeing
vehicle. There, the fleeing driver's vehicle is not hit or
otherwise forced off the road or into another vehicle
or object *by the pursuing police vehicle.* Under the
majority's analysis, the government escapes liability
simply because the fleeing car was hit by a vehicle
other than the police vehicle.

I also note that the Legislature's deliberate inaction
on this subject supports our previous decisions. As
*Rogers* observed, the Legislature has demonstrated

---

[5] I agree with the statements reiterated by the Tennessee Supreme
Court in *Haynes v Hamilton Co*, 883 SW2d 606, 610 (Tenn, 1994), quoting
*Boyer v State*, 323 Md 558, 574; 594 A2d 121 (1991):

> Negligent operation of a car is not limited to the negligent manip-
> ulation of the gas pedal, steering wheel, or brake pedal, such as
> involved in speeding, failure to pay attention to what may be in
> front of the vehicle, failure to apply the brakes, etc. A decision to
> operate or continue operating the car, when a reasonable person
> would not do so, clearly can be "negligent operation." For example,
> if one decides to operate or to continue operating a motor vehicle
> when he is dizzy or otherwise ill, he may be guilty of negligent
> operation. A decision to operate a car or to continue operating a
> car knowing that brakes are faulty may obviously constitute the
> "negligent operation" of the vehicle.

awareness of this Court's decision in *Fiser*. When it chose to amend the governmental immunity act in 1986, it retained unmodified the provisions that were at issue in *Fiser*. Thus, I continue to adhere to this Court's *Rogers* decision, because I believe that *Rogers* supports legislative policy.

II

Added to the unworkability of its new test to determine whether police officers' actions allow recovery under MCL 691.1405; MSA 3.996(105), the majority provides a new hurdle for injured innocent third parties. By overruling *Dedes v Asch*, *supra*, today's majority ignores established proximate causation principles and effectively negates the legislative mandate that fault be determined individually with respect to each contributor to a plaintiff's injuries. MCL 600.6304(1); MSA 27A.6304(1).

Given that the majority has forced this Court to revisit *Dedes*, I would affirm our decision in that case. The majority couches its holding in terms of "the one most immediate, efficient, and direct cause . . . ." *Ante*, p 459. However, in effect, it revisits the dissenting position in *Dedes*, opining that "the proximate cause" in MCL 691.1407(2)(c); MSA 3.996(107)(2)(c) should really read "the one most immediate, efficient, and direct cause preceding an injury . . . ."[6] *Ante*, p 446. As Justice BOYLE opined in *Dedes*, whether "the

---

[6] The majority's construction of the word "the" also ignores the mandates of MCL 8.3b; MSA 2.212(2), which states:

Every word importing the singular number only may extend to and embrace the plural number, and every word importing the plural number may be applied and limited to the singular number.

proximate cause" in MCL 691.1407(2)(c);    MSA
3.996(107)(2)(c),  should be read "the *sole* proximate
cause,"[7] raises "profound consequences for the course
of future litigation involving the government." *Dedes*,
*supra* at 104.

In search of the answer to this question, the major-
ity asserts that the phrase "the proximate cause,"
when used to instruct a jury, actually contemplates
"one cause." *Ante*, p 462.[8] However, as Justice BOYLE
so aptly noted in *Dedes*, this argument has only sur-
face appeal:

> "A general rule of statutory construction is that '[w]ords
> or phrases shall be read in context and construed according
> to the rule of grammar and common usage,' " *Deur v New-
> aygo Sheriff*, 420 Mich 440, 445; 362 NW2d 698 (1984), cert
> den 471 US 1136 (1984), and "[w]hat is 'plain and unambigu-
> ous' often depends on one's frame of reference." *Shiffer v
> Gibraltar Bd of Ed*, 393 Mich 190, 194; 224 NW2d 255
> (1974). The defendants contend that because "the" is a def-
> inite article while "a" is usually indefinite, the Legislature's
> use of the word "the" preceding "proximate cause" demon-
> strates a clear intent to limit liability to only those circum-
> stances in which the defendant is the sole proximate cause.
> This plain meaning argument is buttressed by authority
> from this Court that recognizes a distinction between the

---

In the case at bar, despite the majority's contention to the contrary, the word "the," insomuch as it connotes "the singular number," also "embrace[s] the plural number," meaning more than one.

[7] I detect with increasing frequency a tendency among certain jurists to maintain that a statute is "clear and unambiguous" while adding words to its "plain language" to reach a desired meaning.

[8] One must wonder why the majority resorts to Black's Law Dictionary (5th ed) to determine what meaning the Legislature placed on the word "the." For at pages 458-459 the majority states that "[t]he Legislature's use of the definite article 'the' clearly evinces an intent to focus on one cause." If that were truly the "clear" case, then resort to a dictionary would be unnecessary.

use of "a proximate cause" versus "the proximate cause" in jury instructions.

The source of the surface appeal of the argument is an instructional issue involving proximate cause, of which the practicing bar is acutely aware. However, it cannot be safely assumed that every courtroom connotation is a part of the legislative culture. While to lawyers the phrase "the proximate cause" implies "sole cause" heresy, it is incorrect to conclude that therefore "the" means sole. "The" cause language is inappropriate because "the" is ambiguous and might be understood by the jury to mean either "a" cause or the "sole" cause. Thus, where the proofs raise a question regarding whether more than one party's negligence caused the injury, and the jury is not instructed that there can be more than one proximate cause, reference to "the" and "a" proximate cause is instructional error. As we observed in *Kirby v Larson*, 400 Mich 585, 607; 256 NW2d 400 (1977):

"While it is true that the instructions might have been interpreted to mean a proximate cause, it is also equally true that the jury might have contemplated otherwise."

Moreover, where used to describe the cause in fact of the injury, "the" and "a" are interchangeable and "the" does not mean "sole." As noted by the author of the Restatement:

"In many cases the question before the court is whether the actor's negligence was in fact the cause of the other's harm—that is, whether it had any effect in producing it—or whether it was the result of some other cause, the testimony making it clear that it must be one or the other, and that the harm is not due to the combined effects of both." [Restatement Torts, 2d, § 431, comment b, p 429. Emphasis added.] [*Dedes, supra* at 105-107.]

I continue to find our *Dedes* rationale persuasive, given the lack of any legislative suggestion of an intent to abolish the long-recognized and fundamental tenet of tort law that "[t]here may be more than one proximate cause for the same injury, and the mere fact that some other cause co-operates with the negligence of the defendant to produce the injury for

which suit is brought does not relieve him from liability." *Camp v Wilson*, 258 Mich 38, 42; 241 NW 844 (1932).

The majority contends that *Stoll v Laubengayer*[9] over eighty-five years ago defined proximate cause as "the immediate efficient, direct cause preceding the injury." However, as we noted in *Hagerman v Gencorp Automotive*,[10] "that was merely one of several definitions considered in *Stoll*, and the rule to be gleaned from that case is that proximate cause is a case-by-case analysis."

As we stated in *Hagerman*, this analysis has developed over time to our present understanding of concurrent proximate causation, consistent with the statutory enactment of comparative fault. *Hagerman, supra* at 732. Thus, not only may there be more than one proximate cause of an injury, but, where there is, the negligent wrongdoer's behavior may be referred to as "the proximate cause":

> "[T]here may be two or more concurrent and directly cooperative and efficient proximate causes of an injury. Negligence which was operative at the time an injury was inflicted may constitute the proximate cause of the injury and be actionable, notwithstanding it concurred with the act of a third person to produce the injury." [*Brackins v Olympia, Inc*, 316 Mich 275, 281; 25 NW2d 197 (1946) (emphasis added).]

Thus, as we so aptly stated in *Hagerman*, construing the phrase "the proximate cause" to require one cause contradicts our longstanding recognition of the fact that "there may be two or more concurrent and

---

[9] 174 Mich 701, 706; 140 NW 532 (1913).

[10] 457 Mich 720, 730, n 8; 579 NW2d 347 (1998).

directly cooperative and efficient proximate causes of an injury." *Hagerman, supra* at 733. We have neither a textual nor an historical basis on which to find that the Legislature intended we construe MCL 691.1407(2)(c); MSA 3.996(107)(2)(c) to require only one cause. This is particularly significant given the common law's established recognition of concurrent proximate causation.

Under the majority's reasoning, this tenet is to be abolished. In its place appears a rule relieving a government employee of all liability for negligence if another tortfeasor is negligent, however slightly, as long as the other's negligence is later. The net effect of today's decision is to deny innocent victims of police car chases recovery for their injuries. Applying its rationale, the pursuing police officer will never be the only proximate cause of an injury to an innocent passenger. If a vehicle is fleeing the police, its driver will always be a wrongdoer.

The holding in effect revives the doctrine of contributory negligence with respect to government employees. As Justice BOYLE noted, "It defies common sense and the responsible exercise of our authority to conclude that the Legislature would have provided protection tantamount to eliminating liability without having commented on it."[11] *Dedes, supra* at 115.

---

[11] As *Dedes* notes, this is not a case where the practical effect of a certain statutory provision was difficult to foresee at the time of enactment, making legislative comment unlikely. As proposed and enacted, MCL 691.1407(2); MSA 3.996(107)(2) was intended to limit the liability of lesser government employees in response to this Court's distinction between ministerial and discretionary government activities in *Ross, supra.* The new legislation protected employees, eliminated the *Ross* distinction between ministerial and discretionary activities, extended protection to volunteers, raised the standard from negligence to gross negligence, and specifically defined gross negligence. All these purposes were noted and

There are no grounds to believe that the statute intended absolute immunity for the actions of police officers when chasing fleeing vehicles.

Moreover, MCL 600.6304(1); MSA 27A.6304(1), as amended by 1995 PA 249, provides additional support for the correctness of our decision in *Dedes*. This provision states in relevant part:

> In an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death involving fault of more than 1 person, including third-party defendants and nonparties, the court, unless otherwise agreed by all parties to the action, shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings indicating both of the following:
>
> *      *      *
>
> (b) The percentage of the total fault of all persons that contributed to the death or injury . . . .

Surely, had the Legislature intended to exempt government tortfeasors and enact a separate standard of proximate causation with respect to them, it would have included it in this recently amended section. The language of this section makes clear that all tortfeasors, whether government agents or not, shall be subject to the same standards for purposes of liability.

---

commented on as the bill moved through the legislative process and took its final form. The construction of proximate cause advanced by the defendants and adopted by the majority will enormously limit that liability, much more than the gross negligence standard adopted by the Legislature. Yet, nothing was written about the supposed "plain language" use of "the proximate cause," further negating any interpretation that the Legislature decided to modify the common law with respect to governmental employees. It is difficult to imagine that legislators were in such agreement on this matter that they found it not worth their time to discuss it.

This reasoning is consistent with Justice BOYLE's opinion in *Dedes*, our opinion in *Rogers*, and common-law principles of proximate causation. A police officer's negligence need not be the only or most direct proximate cause of an injury in order to allow recovery. The majority's decision to overturn this Court's well-reasoned precedent and reinstate contributory negligence by judicial fiat is mistaken and unwarranted.

III

In her concurrence, Justice CORRIGAN attempts to defend the majority's disregard for this Court's precedents. She protests that the majority is only righting the wrongs perpetrated by previous members of this Court. An examination of the justifications offered by the majority in defense of its disregard for precedent reveals that these protests ring hollow.

In *People v Graves*,[12] Justice TAYLOR acknowledged:

> It is true of course that we do not lightly overrule a case. This Court has stated on many occasions that "[u]nder the doctrine of stare decisis, principles of law deliberately examined and decided by a court of competent jurisdiction should not be lightly departed." [Quoting *People v Jamieson*, 436 Mich 61, 79; 461 NW2d 884 (1990).]

In this case, instead of determining whether *Fiser* and *Rogers* were "deliberately examined and decided by a court of competent jurisdiction," Justice TAYLOR first uses the dictionary to define the term "resulting from." But instead of analyzing whether plaintiffs' injuries resulted from defendant's action, he merely

---

[12] 458 Mich 476, 480; 581 NW2d 229 (1998).

concludes that "plaintiffs cannot satisfy the 'resulting from' language of the statute where the pursuing police vehicle did not hit the fleeing car or otherwise physically force it off the road or into another vehicle or object." *Ante*, p 457.

The doctrine of stare decisis does "apply with full force to decisions construing statutes or ordinances . . . ." *Boyd v WG Wade Shows, Inc*, 443 Mich 515, 525; 505 NW2d 544 (1993). The wisdom of this rule becomes apparent when members of this Court apply contrived meanings to the language of statutes instead of using accepted legal analysis.

The majority also infuses public policy into its reading of the motor vehicle exception, despite its own oft-repeated admonitions that this Court may not consider public policy when interpreting the plain language of a statute. Clearly, the motor vehicle exception allows plaintiffs to recover when government entities negligently operate a motor vehicle. MCL 691.1405; MSA 3.996(105). The exception says nothing about the duty of police officers to apprehend criminal suspects.

In fact, the Legislature has made it clear that emergency vehicles may exceed posted speed limits *only* in a manner that will not endanger "life or property." MCL 257.603(3)(c); MSA 9.2303(3)(c). But the majority insists that the police officer's duty to apprehend criminal suspects conflicts with (1) plaintiffs' right to recover under these circumstances, and (2) the police officer's duty not to endanger innocent lives when deciding to pursue a criminal suspect. *Ante*, p 457. But where does the language of either the motor vehicle exception or MCL 257.603(3)(c); MSA 9.2303(3)(c) address the duty to apprehend criminal suspects? It

does not. The majority simply places a higher pre-
mium on this consideration, to the derogation of the
explicit intent of the Legislature.

Moreover, not all the cases in which this majority
disposed of prior precedent involved statutory con-
struction. In *Ritchie-Gamester v Berkley*,[13] it over-
ruled *Felgner v Anderson*[14] and *Williams v Wood*.[15]
These cases held that, for injuries arising from recrea-
tional activities, the proper standard is that of ordi-
nary care. The majority substituted a new standard,
reckless misconduct, on the basis of arguments that it
made more "common-sense," and that other states
have adopted a similar rule. *Ritchie-Gamester, supra*
at 89. The majority also stated that it sought to
"encourage[] vigorous participation in recreational
activities." *Id.* It did so without consideration of
whether the rule Michigan courts had applied during
the preceding sixty years had dampened participation
in recreational activities. *Id.*

Finally, Justice CORRIGAN chastises Justice CAVANAGH
because, in his dissenting statement to the order
granting leave in this case, he refers to Justice
BRICKLEY's past service to this Court.[16] I believe that,
in so doing, she clouds the real issue.

---

[13] 461 Mich 73; 597 NW2d 517 (1999).

[14] 375 Mich 23, 56; 133 NW2d 136 (1965).

[15] 260 Mich 322; 244 NW 490 (1932).

[16] 461 Mich 1201, 1204, n 4 (1999). Her footnote indicates that Justice
BRICKLEY joined the majority's opinion in cases that overruled precedent. I
interpret that as an acknowledgment that Justice BRICKLEY's overall record
demonstrates a proper respect for the doctrine of stare decisis. Likewise,
Justice CAVANAGH wished to point out that his criticisms of this current
majority's treatment of the doctrine could not fairly include Justice
BRICKLEY.

I read Justice CAVANAGH's statement as pointing out that the remaining four justices acted together in all of the six listed occasions. Justice BRICKLEY's contributing vote did not change the fact that the remaining members of the Court always acted together. Justice CAVANAGH's separate footnote to Justice BRICKLEY's jurisprudential standards clarified his belief that the latter's record in opposition to overturning precedent extended far beyond the instant cases. Hence, his decision to join the majority on some occasions was irrelevant.

Justice CORRIGAN misconstrues Justice CAVANAGH's obvious intent.[17] In his dissenting statement, Justice CAVANAGH referred to the collective conscience of the majority and its seeming compulsion to act without judicial reserve to nullify past decisions. The majority has affirmatively changed the law, whether through disagreement with the lead opinion in plurality decisions, by expressly overruling precedent, or by forging paths around well-established principles.

Justice CORRIGAN argues that Justice BRICKLEY's actual voting record disproves "[t]he claims that the majority lacks respect for the doctrine of stare deci-

---

[17] More problematic, in footnote 1 of her concurrence, Justice CORRIGAN summarizes Justice BRICKLEY's voting record inaccurately. When referring to Justice CAVANAGH's dissent to the prior order, she claims that Justice BRICKLEY joined the majority opinion in five out of six cases. Her statement is misleading. Justice BRICKLEY joined a majority *opinion* in *McDougall v Schanz/Sobran v McKendrick*, 461 Mich 15; 597 NW2d 148 (1999); *People v Borchard-Ruhland*, 460 Mich 278; 597 NW2d 1 (1999); *People v Carines*, 460 Mich 750; 597 NW2d 130 (1999). Also, he signed the majority order in *McCready v Hoffius*, 459 Mich 1235 (1999). He concurred separately in both *People v Lukity*, 460 Mich 484; 596 NW2d 607 (1999), and *Ritchie-Gamester v City of Berkley, supra*. Even if Justice CORRIGAN is not specific with reference to Justice BRICKLEY's decisions, it is clear that he was part of the majority in four, rather than five, of the aforementioned cases.

sis . . . ." *Ante*, p 470, n 1. However, to find support for my concerns, I need go no further than the majority's opinion in this case. In it, three opinions of this Court are discarded in favor of a strained and erroneous interpretation of the statute involved.

The majority's casual disregard for this Court's past opinions suggests to future courts that they do the same and creates instability in the law of this state.

CONCLUSION

The reasons proffered to overrule *Dedes*, *Rogers*, and *Fiser* are based solely on the majority's subjective, contrived interpretation of the statutes involved. For instance, the Legislature has stated that every time a statute refers to something in the singular, it may be read, also, to mean the plural. MCL 8.3b; MSA 2.212(2). Yet, in a statute where the Legislature referred to one or "the" proximate cause, the majority refuses to include several proximate causes, thereby finding the need to overrule *Dedes*. *Ante*, p 468.

In this decision, the majority exposes itself to criticism that it picks and chooses when to apply its preferred principles of statutory interpretation. Here, it has overruled past decisions of this Court because it claims that past Courts have not interpreted the statute involved properly. It acclaims the virtues of giving statutory language its "plain meaning." But is has given its own meaning to the expression "resulting from," rather than using the plain meaning. Similarly, it admonishes us not to infuse public policy into the plain language of the Legislature, but proceeds to do so here in reaching its interpretation of the statute. As a consequence of this selective use of preferred

principles of statutory interpretation, the majority arrives at the conclusion that *Fiser* and *Rogers* must be overruled.

The majority fails to convince me that *Rogers* and *Fiser* erroneously interpreted the motor vehicle exception to government immunity. It must be reiterated that it has eliminated these rulings without making the extraordinary showing that this Court has consistently demanded before overruling established law.

In the majority's race to overrule precedent, it establishes a rule that will likely yield unconscionable results. Its new "proximate cause" language provides little motivation for police departments to promulgate and enforce coherent rules concerning police chases. There is little incentive for police officers to adhere carefully to such rules, where they exist. A police officer could claim not to be the most direct proximate cause of an accident arising from a police chase, no matter how outrageous the officer's actions.[18] I agree that the fleeing individuals here are responsible to a great extent for plaintiffs' injuries. However, I would not join the majority in automatically holding the police officers harmless.

Consistent with *Dedes* and *Rogers*, I would remand to the trial court for a factual determination of the extent of fault, if any, attributable to the defendant officers.

CAVANAGH, J., concurred with KELLY, J.

---

[18] Of course, this presumes that the fleeing driver's vehicle is not hit or otherwise forced off the road or onto another vehicle or object by the pursuing police officer. See discussion in part I.

CAVANAGH, J. (*dissenting*). I concur with Justice KELLY's dissent in its entirety. However, the majority having taken the opportunity, quite properly, to respond to the dissent, I offer a few brief words of my own in response to the wonderfully defensive concurrence. The concurrence's uncontrolled compulsion to respond to a 1999 statement, and its efforts to reargue the merits of decided cases evidence its perceived shortcomings of the rationale already provided by the majority in these cases. Despite the concurrence's proclamations about the importance of legitimacy and continuity in the law, the concurrence fails to adequately justify this Court's recent routine practice of ignoring precedent and overruling our cases.

I cannot disagree more with the concurrence that today's decision "restores judicial legitimacy by overruling decisions that wrongly usurped the power of the Legislature." *Ante* at 474. To suggest that legitimacy has been restored is to suggest that legitimacy had been lost. One need only review the decisions cast aside by today's decision in order to discover that they were firmly rooted in the law.

Although the concurrence provides an explanation for the Court's recent track record, it provides no justification. I take comfort in the fact that anyone who reads the concurrence with a critical eye will be led back to the cases cited. The criticisms of the majority opinions in the cited cases will not soon be erased.[1]

---

[1] For an explanation on the merits, see the dissenting opinions in *McDougall v Schanz/Sobran v McKendrick*, 461 Mich 15, 38; 597 NW2d 148 (1999) (pointing out an unconstitutional legislative usurpation of judicial power); *People v Lukity*, 460 Mich 484, 504; 596 NW2d 607 (1999) (arguing that *People v Gearns*, 457 Mich 170; 577 NW2d 422 [1998], rather than the majority opinion, was true to MCL 769.26; MSA 28.1096). In *People v Kazmierczak*, 461 Mich 411; 605 NW2d 667 (2000), the dissent pro-

It is unclear exactly how the concurring opinion relates to the merits of the present cases. Rather, the concurrence latches onto a new discussion as a means for rehashing a tangential debate. Yet, paranoia about how a prior debate has been viewed is not a sufficient basis for injecting that former debate into a subsequent phase of this case. Although I could offer further explanations for my dissenting statement from the resubmission order in this case, 461 Mich 1201-1204 (1999), I disagree that this is the time to debate a dissent that focused on whether this Court should manufacture issues to be briefed. Rather, this is the time to decide the issues argued. Thankfully, the majority and dissent have done so.

---

vides an explanation why *People v Taylor*, 454 Mich 580; 564 NW2d 24 (1997), was not "fundamentally flawed" as the concurrence asserts. *Ante* at 472. The *Kazmierczak* dissent amply explained why *Taylor* could be applied, and cautioned against overruling precedent unnecessarily.