*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARK GOSS,

Plaintiff-Appellee,

v

DEPARTMENT OF NATURAL RESOURCES,

Defendant-Appellant.

UNPUBLISHED
May 9, 2024

No. 364150
Court of Claims
LC No. 19-000022-MZ

MARK GOSS and CHRISTY GOSS,

Plaintiffs-Appellants,

v

ESTATE OF ROY LEE PEDERSON,

Defendant-Appellee.

No. 364167
Court of Claims
LC No. 21-000076-MZ

Before: RICK, P.J., and JANSEN and FEENEY, JJ.

PER CURIAM.

In Docket No. 364150, defendant, the Department of Natural Resources (DNR), appeals as of right the order denying its motion for summary disposition. In Docket No. 364167, plaintiffs, Mark Goss (Goss) and Christy Goss (Christy), appeal as of right the order granting summary disposition to defendant, the Estate of Roy Lee Pederson (the Pederson Estate).[1] We reverse the trial court order denying the DNR summary disposition and remand to the trial court for entry of

---

[1] This Court consolidated the appeals in Docket Nos. 364150 and 364167, both of which arise from the same collision. See *Goss v Dep't of Natural Resources*, unpublished order of the Court of Appeals, entered December 27, 2022 (Docket Nos. 364150; 364167).

an order granting summary disposition in favor of the DNR, and affirm the order granting the Pederson Estate summary disposition.

## I. FACTUAL BACKGROUND

On February 26, 2018, a catastrophic collision occurred between a snowmobile operated by Goss and a 2015 John Deere Gator 625i crossover utility vehicle (Gator) operated by Pederson, who was a DNR Ranger. The result of the accident was tragic. Pederson died at the scene, and Goss was seriously injured.

The collision occurred near Sault Ste. Marie, Michigan. Goss and his friend, Joseph Eckelstafer, drove to Sault Ste. Marie from an area near Grand Rapids, Michigan, to ride their snowmobiles. On the day of the incident, Goss was riding on a trail known as Trail 8, and Pederson was grooming a cross-country ski trail known as the Algonquin Ski Trail. The Gator was pulling a grooming rake and was riding on snow tracks. Trail 8, a former railroad grade, has no posted speed limit where it intersects with the Algonquin Ski Trail. It is designed for speed and snowmobiles may travel on it going highway speeds. A private association maintains Trail 8. The Algonquin Ski Trail is a ski pathway that is about eight miles long, and the DNR is responsible for its maintenance. Trail 8 displays a yield sign about 89 feet away from the intersection, and the Algonquin Ski Trail has a stop sign right at the intersection. The Gator traveled at a slow rate of speed (about 8 miles per hour (mph) to 12 mph) when it was on the tracks.

By all accounts, both Goss and Pederson had experience with the area where the incident occurred. Goss is an experienced snowmobile rider. He rode his snowmobile on Trail 8 regularly, but had never seen a ski-trail groomer like the Gator. Pederson also had decades of grooming experience, and he groomed the Algonquin Ski Trail a couple of times per week. His supervisor, Corey Butcher, testified that Pederson was an exemplary employee. Butcher explained that because of the foliage in the area, it was necessary for Pederson to "pull out a little ways" onto Trail 8 to determine whether there were snowmobiles entering the intersection in either direction.

The accident occurred when the two vehicles collided in the intersection and caught fire. There were no eyewitnesses. Goss has no recollection of the accident, and Eckelstafer, who had become separated from Goss because of another stop sign, did not see the accident occur. He would later testify that the men were traveling 55 mph to 60 mph, and that he was traveling about 50 yards behind Goss. Goss testified that his regular practice was to travel about 40 mph to 60 mph down Trail 8.

The Sault Ste. Marie Police responded to Eckelstafer's 911 call. Initially, the officers were unsure what occurred, but later concluded that the Gator had pulled out in front of Goss's snowmobile. Sault Ste. Marie Police Sergeant Francis DeShano (now retired) investigated the accident. He concluded that the accident occurred at a high rate of speed and that visibility in the area was poor because of the surrounding trees. He also estimated that the Gator had traveled halfway across the intersection when the collision occurred. Based on his investigation, Sergeant DeShano concluded that Pederson failed to yield the right-of-way to Goss.

The parties consulted accident-reconstruction experts. Goss's expert, Timothy Robbins, conducted an accident reconstruction and determined that the impact speed was 51 mph. He

concluded there were three possible ways in which the accident may have happened: (1) the Gator rolled through the stop sign at 8 mph and traveled about 12 to 13 feet into the intersection, (2) the Gator did not stop at the stop sign and rolled through the intersection traveling at a speed of about 12 mph, or (3) the Gator stopped and accelerated through the intersection, taking about 2.82 seconds to reach a speed of 6.18 mph. In any of the scenarios, Robbins opined, Pederson failed to yield the right-of-way to Goss, and Goss did not have time to avoid the accident.

In contrast, the experts retained by the DNR and the Pederson Estate concluded that Goss was traveling at least 62 mph, and opined that Goss could see the Gator before he entered the intersection. Collectively, they opined that Goss should have responded to the yield sign by slowing down to reach a speed that allowed him to completely stop to avoid a collision with cross-traffic in the intersection. In other words, the accident was the result of Goss's failure to yield to Pederson while Pederson was in the intersection.

## II. RELEVANT PROCEDURAL HISTORY

Following the accident, Goss sued the DNR in the Court of Claims for negligence and gross negligence. Goss argued that the DNR could not invoke governmental immunity under the governmental tort liability act (GTLA), MCL 691.1401 *et seq.*, because the motor vehicle exception to governmental immunity applied.

Initially, the parties disputed whether the Gator was a motor vehicle for purposes of the motor vehicle exception, and a panel of this Court concluded that it was. See *Goss v Mich Dep't of Natural Resources*, unpublished per curiam opinion of the Court of Appeals, issued July 23, 2020 (Docket No. 349411), p 4. Following discovery, the DNR moved for summary disposition under MCR 2.116(C)(7) (immunity granted by law) and (C)(10) (no genuine issue of material fact). The DNR's overarching argument was that Goss could not establish negligence or causation because there were no eyewitnesses to the accident to testify about Pederson's conduct. Moreover, Goss assumed the risk of the accident by riding his snowmobile. Goss argued, in contrast, that he had ample evidence to establish Pederson's negligence and causation, including the testimony of his expert. The Court of Claims agreed with Goss's position and denied summary disposition. The DNR appealed that decision to this Court as a decision denying immunity to a governmental party. See MCR 7.202(6)(a)(*v*).

While Goss's case against the DNR was pending in the Court of Claims, Goss and Christy (collectively, plaintiffs) sued the Pederson Estate in a separate matter for gross negligence. Christy's claim is limited to loss of consortium. The Court of Claims consolidated the case with Goss's lawsuit against the DNR for purposes of discovery and trial. The Pederson Estate moved for summary disposition, arguing that plaintiffs could not establish that Pederson recklessly disregarded the safety risks associated with his conduct or that his action was the proximate cause of the collision. The Court of Claims agreed with the Pederson Estate, reasoning that plaintiffs could not establish that Pederson acted recklessly. Plaintiffs appeal that decision in this Court, which consolidated the matter with Docket No. 364150. See *Goss v Dep't of Natural Resources*, unpublished order of the Court of Appeals, entered December 27, 2022 (Docket Nos. 364150; 364167).

## III. DOCKET NO. 364150

In Docket No. 364150, the DNR challenges the Court of Claims' decision to deny its motion for summary disposition under MCR 2.116(C)(7) and (C)(10). The DNR argues that the Court of Claims erred by concluding that a genuine issue of material fact existed on whether Goss could establish the motor vehicle exception to governmental immunity outlined in MCL 691.1405. We agree.[2]

### A. STANDARDS OF REVIEW

We review de novo the trial court's decision on a motion for summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). We also review de novo whether governmental immunity applies in a case, *Pike v Northern Mich Univ*, 327 Mich App 683, 690; 935 NW2d 86 (2019), and issues regarding the proper interpretation of a statute, *Bronson Health Care Group, Inc v Esurance Prop & Cas Ins Co*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 363486); slip op at 5.

The DNR moved for summary disposition under both MCR 2.116(C)(7) and (C)(10), but the Court of Claims decided the motion under MCR 2.116(C)(10). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the plaintiff's claim. *El-Khalil*, 504 Mich at 160. Summary disposition is proper when, after considering all the evidence in the light most favorable to the party opposing the motion, the court determines there is no genuine issue of material fact. *Id*. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted).

When reviewing issues of statutory interpretation, we "discern and give effect" to the intent of the Legislature. *Bronson*, ___ Mich App at ___; slip op at 5 (quotation marks and citation omitted). We will start with the language of the statute, which is the most reliable evidence of the Legislature's intent. *Id*. at ___; slip op at 5. "If the language of a statute is clear and unambiguous, the statute must be enforced as written and no further judicial construction is permitted." *Id*. at ___; slip op at 5 (quotation marks and citation omitted).

### B. MOTOR VEHICLE EXCEPTION

The GTLA protects a " 'governmental agency' " from tort liability if the agency " 'is engaged in the exercise or discharge of a governmental function.' " *Pike*, 327 Mich App at 691, quoting MCL 691.1407(1). The plaintiff is responsible to plead facts to avoid application of governmental immunity. *Eplee v Lansing*, 327 Mich App 635, 644; 935 NW2d 104 (2019). In other words, the government is presumed to be immune from tort liability unless the plaintiff can establish that it was not engaged in the exercise or discharge of a governmental function or that the plaintiff's claims fall under an exception to governmental immunity. See generally *Lash v*

---

[2] Given this conclusion and the following analysis, we need not address the DNR's alternative argument that it is entitled to summary disposition because Goss assumed the risk by riding his snowmobile.

-4-

*Traverse City*, 479 Mich 180, 195; 735 NW2d 628 (2007). The GTLA defines a "governmental function," in relevant part, as "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." MCL 691.1401(b). The parties do not dispute that Pederson, on behalf of the DNR (the governmental agency), was engaged in the discharge of a governmental function (grooming a state-operated ski trail) at the time of the incident. Thus, the sole issue for purposes of this appeal is whether Goss can establish that an exception to governmental immunity applies.

Governmental immunity is broad, and the exceptions must be construed narrowly. *West v Dep't of Natural Resources*, 333 Mich App 186, 191; 963 NW2d 602 (2020). The exception at issue in this case is the motor vehicle exception. The exception provides, "Governmental agencies shall be liable for bodily injury and property damage resulting from the *negligent operation* by any officer, agent, or employee of the governmental agency, of a motor vehicle of which the governmental agency is owner, as defined in [the Michigan Vehicle Code, MCL 257.1 *et seq*.]." MCL 691.1405 (emphasis added). This Court previously held that the Gator constituted a motor vehicle for purposes of the motor vehicle exception. *Goss*, unpub op at 4. There is no dispute that Pederson was a government employee and that he was driving a government-owned vehicle. Finally, the DNR does not dispute that Goss sustained serious bodily injuries from the accident. The only question at issue is whether Pederson negligently operated the Gator.

## C. NEGLIGENCE

"To establish a prima facie case of negligence, a plaintiff must prove the following elements: (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Anderson v Transdev Servs, Inc*, 341 Mich App 501, 508; 991 NW2d 230 (2022) (quotation marks and citation omitted). A plaintiff may rely on circumstantial evidence to establish negligence, and negligence may be inferred from the facts and circumstances of the case. *Spiers v Martin*, 336 Mich 613, 616; 58 NW2d 821 (1953). Once the plaintiff has submitted evidence to give rise to a question of fact, the question of reasonableness is one for the trier of fact. *Riddle v McLouth Steel Prods Co*, 440 Mich 85, 96; 485 NW2d 676 (1992). See also *Case v Consumers Power Co*, 463 Mich 1, 7; 615 NW2d 17 (2000) ("Ordinarily, it is for the jury to determine whether a defendant's conduct fell below the general standard of care.").

MCL 691.1405 requires that the plaintiff establish that his injuries "result[ed] from" the negligent operation of a motor vehicle. The DNR relies on *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000), and *Curtis v City of Flint*, 253 Mich App 555; 655 NW2d 791 (2002), to support that the "resulting from" standard is more stringent than the common-law proximate causation test.

In *Robinson*, 462 Mich at 444, the plaintiffs were passengers in vehicles that were fleeing the police. In the context of analyzing the motor vehicle exception, the Michigan Supreme Court concluded that the accident did not "result from" the officers' negligence because the police vehicles did not hit the fleeing vehicles, force them off the road, or force them into another object or vehicle. *Id*. at 456-457. The Court noted, in relevant part, that "the statute does not say that governmental agencies are liable for injuries or property damage 'proximately caused' by the negligent operation of a motor vehicle." *Id*. at 457 n 14. Instead, the statute contained the

"resulting from" language. *Id.* For that reason, the Court declined to "import" a but-for causation standard. *Id.* The Court did not indicate how its holding would apply outside of the context of a police chase.

In *Curtis*, 253 Mich App at 557, the Court of Appeals addressed the motor vehicle exception again in the context of an accident involving an emergency medical vehicle. The plaintiff was injured when he struck a vehicle that had abruptly changed lanes and stopped to allow an ambulance onto the roadway. *Id.* On appeal, the Court of Appeals concluded that *Robinson* was not limited to injuries arising from a police chase. *Id.* at 559, 561. Thus, the emergency vehicle had to be physically involved in the collision for the plaintiff's injuries to "result from" its negligent operation. *Id.* at 562. Because that was not the case, the plaintiff could not establish that his injuries "resulted from" the negligent operation of a government vehicle. *Id.* at 562-563. Relevant to this case, the Court concluded that the holding in *Robinson* was not limited to the police-chase context. *Id.* at 561. The Court once again recognized that the GTLA "allows liability only for injuries 'resulting from' the negligent operation of a government-owned vehicle, as opposed to a lesser 'but for' standard." *Id.* at 561.

Here, the Court of Claims erred in using the but-for causation standard instead of the "resulting from" causation standard. Nevertheless, the error was harmless because there is little (if any) distinction between the resulting-from and but-for causation standards where the two vehicles physically collide. The DNR does not cite any cases that have applied *Robinson* and *Curtis* outside the context where there is no direct contact between the government-owned vehicle and Goss's vehicle. In this case, there is no dispute that the DNR's vehicle contacted Goss's vehicle. There was no third vehicle involved in this accident. Therefore, the distinction between the "resulting from" causation standard and the "but for" causation standard has no meaningful distinction in this context.

## D. CAUSATION

Accordingly, a plaintiff's theory of causation on the basis of "only slight evidence is not enough," nor is a plaintiff's theory of causation sufficient if, "while factually supported," it "is, at best, just as possible as another theory." *Skinner v Square D Co*, 445 Mich 153, 164; 516 NW2d 475 (1994). While a plaintiff "need not negate all other possible causes," he must present sufficient evidence so as to "exclude other reasonable hypotheses with a fair amount of certainty." *Craig v Oakwood Hosp*, 471 Mich 67, 87-88; 684 NW2d 296 (2004) (quotation marks and citations omitted). This can be accomplished by relying on reasonable inferences arising from the evidence, but those inferences must be more than mere speculation or conjecture. *Skinner*, 445 Mich at 164. Specifically, when there is no eyewitness to an accident, the plaintiff cannot rely on mere speculation and conjecture to support his or her claims. *Id.* at 163. In other words, a case may not be submitted to the trier of fact when the evidentiary record would not allow the trier of fact to do anything more than guess. *Id.* at 174.

Here, Goss did not meet his burden of establishing that a genuine issue of material fact existed regarding negligence. As an initial matter, Goss alleged in his complaint that Pederson, acting as an agent of the DNR, was negligent for failing to stop at the stop sign. However, the testimony of Goss's accident-reconstruction expert, Robbins, ultimately did not support that allegation, and Goss never filed an amended complaint. Robbins opined that there were three

different scenarios that likely happened to cause this accident, all of which implicate Pederson as having entered the intersection first.[3] In each scenario, Goss would not have had time to avoid the impact. To believe that one of these three scenarios occurred, as the dissent does, one would have to conclude that Pederson could see the snowmobile approaching at a high speed, and yet intentionally pulled out in front of it. Not only is this nonsensical, but moreover, none of the evidence or testimony supports that conclusion.

Robbins admitted, "I—I don't know what truly happened there. All I can tell you is that I have the three scenarios, and if he did not stop, there was not enough time to perceive and react, and if he did stop, then there was time to perceive and react but not enough to stop before the impact." When confronted with the question, "you don't have an opinion one way or the other whether [Pederson] stopped or not, correct?" Robbins replied, "Correct. Correct." The fact that Robbins has three scenarios establishes no certainty as to his opinion, nor does it create a question of fact. The dissent improperly concludes that Goss was the "favored driver" in this situation. Because Goss had a yield sign, and therefore a duty to anticipate traffic in the crossing, if Pederson was in the intersection, then Goss would have had a duty to yield to the Gator. Thus, the "favored driver" concept does not apply.

Robbins admitted in response to several questions that he did not know what occurred on the date of this accident. He agreed that there were no eyewitnesses, and that much of the evidence had been destroyed. He did not determine, nor did he know, how far away a Gator in the middle of the intersection would have been observable to a snowmobile driver on the trial. He said, "I don't know. I wasn't there." He testified that the signs at the intersection had been changed when he visited the scene, and it would not be scientifically appropriate for him to make a determination at that point. He made no determination what speed the Gator was traveling at, stating that he had "no idea what the acceleration factor of this specific Gator under these conditions and that grade is." When asked whether he had any evidence or opinion on whether the gas cans or propane tank on the back of the Gator exploded, Robbins answered, "I don't know what happened." Overall, Robbins was unequivocal in his opinion that it is unknown whether Pederson stopped at the stop sign:

---

[3] Robbins considered three scenarios based on videos that one of the DNR's experts provided with the Gator traveling at 12 miles per hour, 8 miles per hour, and then proceeding onto the trail. Robbins testified in his deposition about each of the three scenarios he reconstructed: (1) the Gator did not stop and rolled through the stop sign at 8 miles per hour, which would take about 1.1 seconds to travel 12.8 feet onto the snowmobile trail; (2) the Gator did not stop and rolled through the stop sign at 12 miles per hour, which would take even less time to arrive 12.8 feet onto the center of the trail; and (3) the Gator stopped and accelerated with a nominal drag factor of .10 that would take 2.82 seconds to go 12.8 feet forward to the area of impact. Robbins testified that with no evidence of Goss breaking, there was no time for Goss to perceive and react to the Gator crossing the trail.

*Q*. Of course there are no witnesses—would you agree with me, from everything that you've reviewed, nobody knows whether Mr. Pederson stopped at the stop sign or did not stop at the stop sign?

*A*. Correct.

This testimony underscores the holdings of *Skinner*, which analyzed the opinion of *Jordan v Whiting Corp*, 396 Mich 145, 240 NW2d 468 (1976), which held that " '[t]he mere possibility that a defendant's negligence may have been the cause, either theoretical or conjectural, of an accident is not sufficient to establish a causal link between the two.' " *Skinner*, 445 Mich at 165-166, quoting *Jordan*, 396 Mich at 151. In *Jordan*, "[t]he sole evidence presented consisted of testimony from the plaintiff's expert regarding purely hypothetical situations. The expert was unable to give an opinion regarding whether the lack of grounding had any causal correlation with the decedent's particular electrocution." *Skinner*, 445 Mich at 169. "[T]here must be facts in evidence to support the opinion testimony of an expert." *Id*. at 173 (quotation marks and citation omitted). Likewise, the plaintiffs' circumstantial evidence in *Skinner* "did not afford a reliable basis from which reasonable minds could infer that more probably than not, but for the defect in the Square D switch, Mr. Skinner would not have been electrocuted." *Id*. at 171. Goss's reliance on the testimony of Robbins is too speculative to establish a genuine issue of material fact regarding causation, and as such, the trial court erred in denying the DNR's motion for summary disposition.

Goss's reliance on the testimony of Sergeant DeShano fails for the same reason. Sergeant DeShano concluded, based on the results of his accident investigation, that the accident occurred at a high rate of speed. He noted that there were visibility issues around the intersection because the area was wooded. Thus, Pederson needed to pull the Gator into the intersection by at least two feet to get a clear view of Trail 8. Sergeant DeShano offered an expert opinion that Pederson failed to yield the right-of-way to Goss. However, Butcher, Pederson's supervisor, testified that it was well known that snowmobiles would ride down Trail 8 at any speed, and so it was important that the Gator come to a complete stop at the stop sign. He explained that it was necessary to inch the Gator up toward the intersection and to look both ways to ensure that a snowmobile was not coming down the trail. Pederson, an experienced trail groomer, was expected to determine whether it was safe to cross before proceeding into the intersection. The need for caution was particularly true considering that Pederson was carrying fuel in the Gator.

Goss relies on DeShano's testimony to argue that he did nothing wrong in operating his snowmobile. Sergeant DeShano's opinion, however, also fails to conform with the requirements of *Skinner*, *id*. at 173, as there are no facts to support his opinion that Pederson failed to stop or yield to Goss. Butcher testified that Pederson exercised caution when operating the Gator. And the DNR's accident-reconstruction expert, Carl Savage, Jr., opined that the Gator had either slowed or stopped in the intersection at the time of impact while Goss was traveling at least 62 mph. Because the facts of this case are limited by Goss's memory loss, Pederson's death, the destruction of much of the physical evidence during the fire, and the lack of any eyewitnesses, any theory on what occurred could be just as correct as any other theory. But the lack of data available to all of the testifying witnesses results in opinions that are too speculative to establish a genuine issue of material fact.

Importantly, when asked if he assumed that Goss did not see the yield sign, Robbins testified that he did not know. When asked if he knew if part of the yield sign was obstructed, Robbins answered, "I don't know. I wasn't there the day of the crash; I couldn't tell you." Additionally, Sergeant DeShano did not comment on Goss's duty to yield at the intersection, and how that could have contributed to the accident. The evidence established that the Gator was in the middle of the intersection when the accident occurred, leaving enough room for the snowmobile to maneuver around it. However, several of the witnesses testified that there was no evidence of any braking by the snowmobile, and therefore a lack of evidence whether Goss fulfilled his duty to yield. Goss is an experienced snowmobile rider. He rode on Trail 8 at least 1,000 times before the accident. Trail 8 did not contain a speed limit, so Goss was not obligated to travel at any specific speed. Goss would usually travel at around 40 mph to 60 mph down Trail 8, and he sometimes traveled as fast as 65 mph. When he saw skiers on other snowmobile trails, his practice was to come to a complete stop. Although witness credibility and deciding which expert to believe are issues for the trier of fact to decide, see *Guerrero v Smith*, 280 Mich App 647, 669; 761 NW2d 723 (2008), based on this evidence, it is impossible to say that Pederson was negligent and that as a result, Goss's injuries occurred.

Viewing the evidence in the light most favorable to Goss, we conclude that the factual record does not establish a genuine issue of material fact regarding negligence. The evidence only establishes that an accident took place, which is an insufficient basis on which to infer causation. See *Skinner*, 445 Mich at 174. Goss was required to set forth specific facts that would support a reasonable inference of cause and effect; rather, Goss's causation theory is premised on mere conjecture and speculation. *Id*. He failed to meet his burden to present sufficient evidence to "exclude other reasonable hypotheses with a fair amount of certainty," *Craig*, 471 Mich at 87-88, particularly where the experts retained by the DNR and the Pederson Estate opined that Goss could have seen the Gator before he entered the intersection, that Goss should have responded to the yield sign by slowing down to reach a speed which would allow him to stop to avoid collision with cross-traffic, and that the accident was the result of Goss's failure to yield to Pederson while the Gator was in the intersection. Therefore, the Court of Claims erred in denying the DNR summary disposition, and remand for entry of an order granting the DNR's motion is warranted.

## IV. DOCKET NO. 364167

In Docket No. 364167, plaintiffs argue that the Court of Claims erred by granting the Pederson Estate's motion for summary disposition on the issue of gross negligence. We disagree.

## A. STANDARDS OF REVIEW

The Pederson Estate moved for summary disposition under both MCR 2.116(C)(7) and (C)(10). As discussed earlier, we review de novo the trial court's decision on a motion for summary disposition. *El-Khalil*, 504 Mich at 159. We also review de novo whether governmental immunity applies in a particular case. *Pike*, 327 Mich App at 690.

Summary disposition under MCR 2.116(C)(7) is warranted if the claim is barred by immunity granted by law. *Id*. "The contents of the complaint must be accepted as true unless contradicted by the documentary evidence." *Id*. (quotation marks and citation omitted). The documentary evidence is viewed in the light most favorable to the nonmovant. *Id*. "If there is no

factual dispute, a trial court must determine whether summary disposition is appropriate under MCR 2.116(C)(7) as a matter of law." *Id.* at 690-691.

A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the plaintiff's claim. *El-Khalil*, 504 Mich at 160. Summary disposition is proper when, after considering all evidence in the light most favorable to the party opposing the motion, the court determines there is no genuine issue of material fact. *Id.* "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id.* (quotation marks and citation omitted).

## B. GROSS NEGLIGENCE

Government employees are generally immune from tort liability when acting in the scope of their authority, unless their conduct constituted gross negligence. *Tarlea v Crabtree*, 263 Mich App 80, 89; 687 NW2d 333 (2004). MCL 691.1407(2) provides, in relevant part:

> Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by the [officer or employee] while in the course of employment . . . if all of the following are met:
>
> (a) The [officer or employee] is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The [officer's or employee's] conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

The GTLA defines gross negligence as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a).

This Court has explained that gross negligence requires "almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Tarlea*, 263 Mich App at 90. "It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Id.* Evidence of ordinary negligence does not create a question of fact about whether the defendant was grossly negligent. *Id.* at 90 n 11. And "[s]imply alleging that an actor could have done more" is not enough to establish gross negligence. *Id.* at 90.

Additionally, the gross negligence must be "the" proximate cause of the accident, meaning " 'the one most immediate, efficient, and direct cause . . . .' " *Id.* at 89, quoting *Robinson*, 462 Mich at 458-459. It is not enough that the defendant's conduct was "a" proximate cause of the plaintiff's injuries. *Tarlea*, 263 Mich App at 92. The plaintiff bears the burden to establish that the government employee's conduct was grossly negligent. *Ray v Swager*, 501 Mich 52, 65 n 21;

903 NW2d 366 (2017). In *Ray*, the Court explained that factual causation and legal causation remain relevant in the analysis:

> Determining whether an actor's conduct was "the proximate cause" under the GTLA does not involve a weighing of factual causes. Instead, so long as the defendant is *a* factual cause of the plaintiff's injuries, then the court should address legal causation by assessing foreseeability and whether the defendant's conduct was *the* proximate cause. [*Id*. at 74.]

The parties do not dispute that Pederson was acting within the scope of his authority as a DNR Ranger, or that the DNR was engaged in the exercise or discharge of a governmental function by grooming the Algonquin Ski Trail. The only contested issues on appeal are whether Pederson's conduct amounted to gross negligence and whether his conduct was the proximate cause of Goss's injuries.

We agree with the Court of Claims that even when viewing the evidence in the light most favorable to plaintiffs, reasonable minds could not conclude that Pederson's conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury results. There is no evidence in the record that would support that Pederson acted with a more culpable state of mind, meaning that he simply did not care whether an injury resulted from his conduct. Specifically, without eyewitnesses to the accident, it is not clear if Pederson completely disregarded the stop sign before entering the intersection, or stopped briefly but failed to exercise due care to ensure no snowmobiles were coming down the trail. Both Robbins and Sergeant DeShano acknowledged that it was possible that Pederson had stopped at the intersection and then proceeded into the intersection.

Plaintiffs argue that the evidence that Pederson failed to stop at the stop sign constitutes evidence of gross negligence. Plaintiffs' expert has narrowed the possibilities to three scenarios, each of which implicate Pederson as being at fault for the accident. In two of the three scenarios, Pederson entered the intersection without stopping. However, in one of the three scenarios, Pederson briefly stopped before entering the intersection. Robbins has acknowledged that he cannot say which of the three scenarios occurred. They are all equally possible. And even if Pederson drove through the stop sign, there is no evidence that he saw the stop sign and disregarded it. Therefore, even when viewing the evidence in the light most favorable to plaintiffs, there is no evidence that Pederson completely disregarded the stop sign or that he simply did not care about the safety or welfare of those in his charge. The Court of Claims reached the correct decision by granting the Pederson Estate's motion for summary disposition.

## V. CONCLUSION

In Docket No. 354150, we reverse the trial court order denying the DNR summary disposition, and remand for entry of an order granting its motion. In Docket No. 364167, we affirm. We do not retain jurisdiction.

/s/ Michelle M. Rick
/s/ Kathleen Jansen

-11-